616 F.2d 240
 STATE of NEW HAMPSHIRE DEPARTMENT OF EMPLOYMENT SECURITY, et
al., Petitioners,
v.
The Honorable F. Ray MARSHALL, Secretary of Labor of the
United States, and the United States Department of
Labor, Respondents.
 No. 78-1564.
 United States Court of Appeals,
First Circuit.
 Argued May 11, 1978.
Decided Feb. 20, 1980.
 
 Charles S. Rhyne, Washington, D. C., and James E. Morris, Concord, N. H., with whom Edward F. Smith, Gen. Counsel, Concord, N. H., Paul V. Kenneally, William S. Rhyne, Martin W. Matzen, Stephen P. Elmendorf and Rhyne & Rhyne, Washington, D. C., were on brief, for petitioners.
 Robert T. Duffy, Atty., Tax Div., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Leonard J. Henzke, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for respondents.
 George Kaufmann, Washington, D. C., with whom Zwerdling & Maurer, A. L. Zwerdling, Janet Kohn, Leonard Lesser, J. Albert Woll, Gen. Counsel, AFL-CIO, Laurence Gold, Sp. Counsel, AFL-CIO, and Edward J. Hickey, Jr., Gen. Counsel, Washington, D. C., Public Employee Dept., AFL-CIO, were on brief, for American Federation of Labor, et al., amicus curiae.
 Before CAMPBELL and BOWNES, Circuit Judges, DEVINE, District Judge.*
 BOWNES, Circuit Judge.
 
 
 1
 This is an appeal pursuant to 26 U.S.C. § 3310[1] of the decision of the Secretary of Labor that the New Hampshire Unemployment Compensation law fails to conform in six separate respects with the requirements of the Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301-3311.
 
 
 2
 In order to understand the issues involved, some explanation of the unemployment compensation law is necessary. The law has its roots in the Great Depression when unemployment was so widespread that the separate states were unable to meet the basic needs of their citizens. Several states, of which Wisconsin was the leader and New Hampshire an early follower, enacted their own unemployment insurance programs. The financing for these programs was obtained mainly by a tax on private employers. Many states, however, refused to enact such programs fearing that the tax on local employers would cause them to flee to other states which did not have such a law. The federal unemployment insurance law was thus devised to meet a national problem. The constraints of federalism and the dictates of practical politics resulted in legislation designed to equalize the burden on the states with full participation by all. This was accomplished by the inducement of tax credits to private employers and outright grants made available to the states to help defray the administrative costs of the program. The tax on the private employer was levied and collected by the state. The moneys collected had to be promptly remitted by the states to the Secretary of the Treasury. A credit of up to 90% of the tax due was given the employer if he had made contributions to his state's unemployment insurance fund. The tax credit and the grants were contingent on certification by the Secretary of Labor that the state had enacted an unemployment compensation program that conformed to federal statutory requirements.
 
 
 3
 There was no direct statutory command to the states requiring them to conform to federal law. The federal government made an offer to the states which they could accept or refuse. Up until now, all the states found the combination of tax credits to its private employers and outright grants in return for conforming legislation an offer that could not be refused.[2]
 
 
 4
 Although the Act has been extensively amended since its inception in 1935, the basic design and statutory machinery have remained constant. The present statutory machinery works as follows. Under 26 U.S.C. §§ 3301 and 3306(b)(1), private employers are taxed an amount equal to 3.4 percent of the first $6,000 in wages paid each employee. 26 U.S.C. § 3302(a)(1) allows a credit of up to 2.7 percent of such wages against the tax for the employer's contribution to an unemployment fund maintained under state law. But the employer can obtain this credit only if the state's unemployment law is certified by the Secretary of Labor as provided in 26 U.S.C. § 3304.
 
 
 5
 26 U.S.C. § 3304(a) requires that the Secretary of Labor approve any state unemployment compensation law that conforms to the federal requirements. Section 3304(b) requires the Secretary to notify the governor of the state of such approval, and section 3304(c) requires the Secretary to certify such approval to the Secretary of the Treasury. Failure to obtain certification means not only the loss of FUTA tax credits for private employers, but also the loss to noncertified states of two kinds of federal grants. One grant goes towards the cost of administering the state's unemployment compensation program. 42 U.S.C. §§ 501-503. The other goes towards the administration of public employment offices which provide for job-finding, employment recruiting and other services. 29 U.S.C. §§ 49-49k.
 
 
 6
 Coverage under the unemployment compensation law was modified, restricted and expanded in 1976 by amendments to FUTA. The changes that concern us are as follows.
 
 
 7
 1. Employees of a state and its political subdivisions were required to be covered. 26 U.S.C. § 3304(a)(6)(A), 26 U.S.C. § 3309(a)(1)(B), and 26 U.S.C. § 3306(c)(7).
 
 
 8
 2. Coverage was extended to the employees of nonprofit schools which are not institutions of higher learning. 26 U.S.C. § 3304(a)(6)(A), 26 U.S.C. § 3309(a)(1)(A), and 26 U.S.C. § 3306(c)(8).
 
 
 9
 3. Political subdivisions of a state were given the option of reimbursing the state for unemployment benefits paid to former employees in lieu of making payments in the same manner as private sector employees. 26 U.S.C. § 3304(a) (6)(B) and 26 U.S.C. § 3309(a)(2).
 
 
 10
 4. 26 U.S.C. § 3304(a)(14)(A), (B) and (C) restricted the coverage of aliens, required uniform reporting of alien status data and imposed the preponderance of the evidence test for denying compensation based on alien status. Under 26 U.S.C. § 3304(a)(9)(A), denial of compensation to an alien from a country contiguous to the state of employment solely on the basis that he filed another claim in that country was forbidden.
 
 
 11
 5. Coverage afforded to professional athletes was restricted by prohibiting the payments of benefits between athletic seasons. 26 U.S.C. § 3304(a)(13).
 
 
 12
 6. The coverage of employees of educational institutions was modified in regard to the coverage of professional and non-professional employees between academic terms or years, and during vacation periods and vacation recesses. 26 U.S.C. § 3304(a)(6)(A).
 
 
 13
 This case was precipitated by the veto on June 23, 1978, by the then governor of New Hampshire, of a bill that was intended to bring the New Hampshire Unemployment Compensation Law into conformity with the provisions of 26 U.S.C. § 3304. The state had amended its unemployment compensation law, effective January 1, 1978, in an effort to conform with the 1976 amendments. It was notified by the Secretary of Labor in February of 1978 that he had serious questions as to whether this law conformed with federal requirements. This led to the June, 1978, legislation, the veto of which was accepted by the legislature.
 
 
 14
 After the veto of the conformity legislation, a hearing pursuant to 26 U.S.C. § 3304(c), was scheduled by the Department of Labor on whether New Hampshire was in conformity in regard to the five categories of coverage and the optional payment provision for political subdivisions of the state. The hearing was held on September 14 and 15, 1978. In addition to the six conformity issues, New Hampshire challenged the constitutionality of the 1976 amendments as they related to coverage of the employees of a state and its political subdivision. Indeed, almost all of the evidence introduced by New Hampshire focused on the constitutional issue. The administrative law judge (ALJ) found that New Hampshire's unemployment law failed to conform with federal law in all six respects claimed by the Secretary. He made findings of fact as to the constitutional issue, but made no ruling thereon. In reviewing the opinion of the ALJ, the Secretary made additional findings, modified a conclusion of law, corrected some errors and then adopted the findings of facts and conclusions of law of the ALJ as his own.**
 
 
 15
 The parties differ on the scope of our review. Petitioners focus on the constitutionality of the 1976 amendments while respondents assert that, if we uphold the findings of statutory violations, we need not and should not reach the constitutional issue. While the course suggested by respondents is tempting, we feel that we must decide both the conformity and constitutional issues.
 
 
 16
 The state did not meet the conformity requirements of 26 U.S.C. § 3304, nor does it so claim. As already noted, it introduced practically no evidence at the hearing on conformity and did not urge that it had complied with the law. New Hampshire's brief is devoted almost exclusively to the constitutional question. In fact, it admits nonconformity by stating, "New Hampshire has failed to satisfy the Secretary as to the requirements of the 1976 amendments, solely because of its refusal to amend its law to accommodate the unconstitutional public sector program financing requirements." Brief at 66. This admission is repeated in its supplemental brief at 11.
 
 
 17
 This is clearly not the type of case where statutory interpretation makes it unnecessary to meet the constitutional issues. New Hampshire made it clear before the ALJ at the hearing, and before us, that it was refusing to conform because it felt that the statute itself was unconstitutional. New Hampshire's decision to put all its eggs in the constitutional basket, however, does not mean that we can avoid our statutory duty of review of the Secretary's order. See New York City Transit Authority v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). We must determine whether there is substantial evidence on the record to support the Secretary's findings.[3]
 
 
 18
 The evidence presented at the hearing can be summarized as follows. New Hampshire was advised during the period October 21, 1976, through June 24, 1978, by the Department of Labor what amendments would be necessary to bring its unemployment compensation law into conformity with 26 U.S.C. § 3304. The Department of Labor specifically informed the state that its law was deficient in the six categories already outlined.
 
 
 19
 The evidence was uncontradicted that, although New Hampshire has provided full unemployment insurance coverage for its permanent and classified civil service employees, temporary and seasonal workers and those not classified are not covered. N.H.Rev.Stat.Ann. § 282:1H(4)(g) and (q) specifically exclude from coverage employees of political subdivisions and nonclassified state workers. The finding of the Secretary that New Hampshire did not meet the requirements of federal law as to coverage of employees of the state and its political subdivisions was clearly correct. This finding is also the basis for the Secretary's determination that the option provisions of the federal statute were not met because, under New Hampshire law, N.H.Rev.Stat.Ann. § 282:6A-2, payments into the unemployment compensation fund by political subdivisions of the state were limited to those who had elected coverage.
 
 
 20
 N.H.Rev.Stat.Ann. § 282:1H(4)(s)(3) specifically excludes from coverage those "in the employ of a school which is not an institution of higher education." This is directly contrary to the 1976 FUTA amendment which requires the states to cover employees of nonprofit schools below the level of institutions of higher education.
 
 
 21
 Under subsections (B) and (C) of 26 U.S.C. § 3304(a)(14), information as to alien status must be uniformly required from all compensation applicants, and a state agency can only deny compensation because of alien status on a preponderance of the evidence. New Hampshire law does not have any alien status conforming provisions. Under N.H.Rev.Stat.Ann. § 282:1O (1)(a), it is specified that wages shall not include the amount of any payment to an alien unless he was in the United States under color of law. The Secretary found this provision was ambiguous and might conflict with federal law relative to aliens from a country contiguous to that of the state in which he is employed. We agree.
 
 
 22
 The Secretary properly found that, under New Hampshire law, N.H.Rev.Stat.Ann. § 282:1O, payments to athletes between seasons were not prohibited as required by federal law, but only reduced by eliminating the sports income from the athlete's base period earnings.
 
 
 23
 The Secretary's findings as to employees of educational institutions are based on a restricted and technical reading of the federal statutory provisions. If this were the only issue, we might be persuaded to find that New Hampshire was in substantial compliance, but the broad provisions of the New Hampshire statute, N.H.Rev.Stat.Ann. § 282:3F, leave too much to interpretation and construction to satisfy the tight federal requirements.
 
 
 24
 We uphold the decision of the administrative law judge, as modified and adopted by the Secretary, that New Hampshire's Unemployment Compensation law was in the six respects specified not in conformity with the requirements of the implicated 1976 amendments to FUTA.
 
 
 25
 The constitutional issue can be stated thusly: do the 1976 amendments to FUTA violate the sovereign integrity of the states and impair their ability to function effectively under the federal system as guaranteed by the tenth amendment.
 
 
 26
 The basic question is whether this case falls within the new furrow ploughed by National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), or follows in the wake of Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). In Usery, the Supreme Court, in a five to four decision, overruled Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968),[4] and held that the 1974 amendments of the Fair Labor Standards Act (FLSA) extending its provisions to employees of the states and their political subdivisions were unconstitutional and prohibited by the tenth amendment. Petitioners urge that its holding and rationale also doom the 1976 FUTA amendments which apply to the same employee groups.
 
 
 27
 We note first that only two of the six nonconformity findings implicate the tenth amendment, the one pertaining to coverage of employees of the state and its political subdivisions[5] and the option given these entities relative to the method of payment.[6]
 
 
 28
 Our analysis begins with the obvious; that we are dealing with a different federal statute and, more importantly, a different regulatory method than was at issue in Usery. The minimum wage and maximum hour provisions of the Fair Labor Standards Act (FLSA) invalidated in Usery were imposed on the states by command. The authority for such command rested on the commerce clause. On the other hand, the 1976 FUTA amendments, following the design of the original Act, were not based on the commerce clause and were not directly imposed on the states which had the option of conforming or not.
 
 
 29
 There is no doubt that Usery focused on the command of the FLSA amendments that the states must adopt the maximum hours and minimum wage provisions for its own employees.
 
 
 30
 The Act, speaking directly to the States qua States, requires that they shall pay all but an extremely limited minority of their employees the minimum wage rates currently chosen by Congress.
 
 
 31
 National League of Cities v. Usery, supra, 426 U.S. at 847-48, 96 S.Ct. at 2472.
 
 
 32
 But, like the minimum wage provisions, the vice of the Act as sought to be applied here is that it directly penalizes the States for choosing to hire governmental employees on terms different from those which Congress has sought to impose.
 
 
 33
 Id. at 849, 96 S.Ct. at 2473.
 
 
 34
 This command to the state is given bite by 29 U.S.C. § 216, which provides for both civil and criminal penalties in the event of a violation.
 
 
 35
 In contrast, the basic premise and statutory scheme of the federal-state unemployment compensation program, which have remained unchanged since 1935, are based on the concept that a state is free to accept federal conditions by conforming to federal statutory requirements or can refuse to participate entirely. Unlike the legislation at issue in Usery and Maryland v. Wirtz, supra, the commerce clause is not implicated. Congress chose to advance this legislation through its spending power. In Steward Machine Co. v. Davis, supra, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), the validity of the tax on employers was upheld against constitutional attack. Mr. Justice Cardozo, writing for the majority, outlined the history and purpose of this historic legislation and held that "(t)he excise is not void as involving the coercion of the states in contravention of the Tenth Amendment or of restrictions implicit in our federal form of government." Id. at 585, 57 S.Ct. at 890. An attack on a state's (Alabama) conforming legislation on the ground that its enactment was coerced by the federal government was rebuffed in Carmichael v. Southern Coal Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937).
 
 
 36
 Petitioners argue, however, that this option of the state to refuse to participate in the program is illusory, since the severe financial consequences that would follow such refusal negate any real choice. Petitioners assert that, while the 1976 federal statutory requirements are not imposed by fiat, as with the 1974 amendments to the FLSA, the coercive effect is the same. This is particularly so, they contend, because most of the financial burden for a state's decision not to conform falls on its private employers through loss of federal tax credits. All parties agree that the cost to the private employers in New Hampshire will be about forty million dollars in 1978 tax credits. It is argued that by holding the private employers "ransom," Congress coerces compliance.
 
 
 37
 We do not agree that the carrot has become a club because rewards for conforming have increased. It is not the size of the stakes that controls, but the rules of the game.[7] The basic design and mechanism of the Act have not changed since 1935. Its coverage has been extended,[8] but the percentage of tax credits remains essentially the same.[9] The primary reason, of course, for the increase in the dollar amount of tax credits has been the expansion of our economy since 1935. The increase in the number of employers and employees and the amount paid in wages has meant a corresponding increase in the dollar amount of tax credits.
 
 
 38
 We must also recognize that, since 1935, the philosophy and objective of the unemployment compensation program, viz., that unemployment is a national problem that must be dealt with on a national basis, have been woven into the fabric of our society.[10]
 
 
 39
 In Usery, the Court specifically refrained from deciding whether the spending power could be unconstitutionally used to impair state sovereignty:
 
 
 40
 We express no view as to whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the spending power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment.
 
 
 41
 National League of Cities v. Usery, 426 U.S. at 852 n.17, 96 S.Ct. at 2474 n.17.
 
 
 42
 We construe Usery to hold that congressional legislation based upon the commerce clause which impairs the sovereign functions of the states is unconstitutional. Two other circuits have refused to extend the Usery doctrine to legislation not squarely bottomed on the commerce clause. In Usery v. Charlestown City School District, 558 F.2d 1169 (4th Cir. 1977), and in Usery v. Allegheny County Institution District, 544 F.2d 148 (3d Cir. 1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977), the courts rejected arguments that, in light of National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Equal Pay Act was an unconstitutional exercise of congressional authority under the commerce clause. Both courts viewed the application of the Equal Pay Act to the states as a legitimate exercise of congressional authority to adopt legislation enforcing the fourteenth amendment's guaranty of equal protection of the law. Similarly, in Arritt v. Grisell, 567 F.2d 1267 (4th Cir. 1977), the court held that Congress enacted the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq., under section 5 of the fourteenth amendment,[11] rejecting the contention that the ADEA was impermissibly grounded on the commerce clause.
 
 
 43
 The tax at issue here, FUTA, is not based on the power of Congress under the commerce clause. Congress has relied on the attraction of the federal purse to persuade the states that it is in their best interests to conform to a national unemployment insurance program. Inducing state participation in national programs by the offer of federal funds is not limited to the unemployment compensation program. In North Carolina ex rel. Morrow v. Califano, 445 F.Supp. 532 (E.D.N.C.1977), aff'd, 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978), the issue of the constitutionality of a conformity addition to the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k et seq. was raised. In upholding the constitutionality of the Act, the court specifically stated:
 
 
 44
 It must be remembered that this Act is not compulsory on the State. Unlike the legislation faulted in State of Maryland v. Environmental Protection Ag., supra, 530 F.2d 215 (4th Cir.), it does not impose a mandatory requirement to enact legislation on the State; it gives to the states an option to enact such legislation and, in order to induce that enactment, offers financial assistance. Such legislation conforms to the pattern generally of federal grants to the states and is not "coercive" in the constitutional sense (emphasis in original).
 
 
 45
 Id. at 535-36.
 
 
 46
 Under the Medicaid Act, Title XIX of the Social Security Act of 1965, participating states are enabled by the use of federal funds to provide medical services for welfare recipients. A state's participation in Medicaid is voluntary but, if it chooses to participate, its plan must conform to the requirements imposed by the Medicaid Act. Preterm, Inc. v. Dukakis, 591 F.2d 121, 124 (1st Cir.), cert. denied, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979).
 
 
 47
 Since it can be argued that Usery was based on two separate and distinct concepts, the tenth amendment supremacy over the commerce clause and/or the impairment of state sovereignty, we next consider the evidence presented at the Labor Department hearing on impairment of New Hampshire's sovereignty due to the cost of extending unemployment benefits to uncovered state employees and employees of its political subdivisions. The finance officer of the City of Manchester (New Hampshire's largest city) testified that over the past nine years no permanent employees had been laid off, but the cost of covering the City's temporary seasonal employees would require costly new staffing and record-keeping practices which would affect the ability of the City to maintain existing programs. The testimony of Elizabeth Puddington, a consultant to the New Hampshire School Boards Association, was that, because of New Hampshire's dependence on the property tax and the difficulties inherent in increasing revenues therefrom, the cost of extending unemployment benefits to public schools would probably result in a curtailment of educational programs.
 
 
 48
 The sale of liquor through state licensed stores is one of the main sources of state revenue. The Director of Merchandising and Accounts of the New Hampshire State Liquor Commission estimated that the cost of extending unemployment benefits to Commission employees would be $75,000-$80,000 annually with a potential cost of $120,000 annually. The Comptroller of the State testified that the annual cost under the reimbursement method of financing unemployment benefits could amount to as much as $4.3 million and that, under the alternate contributing tax method, the cost would be about $300,000.
 
 
 49
 The cost to the New Hampshire Department of Employment Security for administering the additional coverage would be between $75,000 and $150,000 annually, according to the affidavit of its deputy commissioner. There was also affidavit testimony as to the additional cost to the Department of Health and Welfare $30,528 and $4,830 for the Fish and Game Department.
 
 
 50
 The overall cost to New Hampshire and its political subdivisions for unemployment coverage was the subject of expert testimony at the hearing. Lennox L. Moak was the expert for the state. He testified that the additional cost to the state would be $200,000 and $900,000 for its political subdivisions, for a total of $1,100,000. Dr. James D. Van Erden testified as an expert for the Labor Department. He estimated that the total cost to New Hampshire and its political subdivisions for fiscal 1978 would amount to $227,585, for fiscal 1979, $288,935, and for fiscal 1980, $330,787.[12]
 
 
 51
 Unlike the effect of the wage and hour standards in Usery, we do not think that this evidence establishes that extending coverage to the employees of New Hampshire and its political subdivisions will "significantly alter or displace" the ability of New Hampshire "to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health and parks and recreation." National League of Cities v. Usery, 426 U.S. at 851, 96 S.Ct. at 2474. FUTA does not set the wage rates or affect hours worked. All it does is insure unemployment benefits for state employees. Its administration is entirely within the control of the state. See Pearce v. Wichita County, 590 F.2d 128 (5th Cir. 1979), and Marshall v. City of Sheboygan, 577 F.2d 1 (7th Cir. 1978), in which the Equal Pay Act was upheld as constitutional under the commerce clause on the grounds that, unlike the minimum wage provisions condemned in Usery, the provisions of the Equal Pay Act did not impermissibly interfere with the states' employment scheme.
 
 
 52
 We hold that the 1976 amendments to FUTA relative to employees of a state or its political subdivisions do not impair the sovereignty of New Hampshire and have not been rendered unconstitutional by Usery.
 
 
 53
 There is one more matter that requires our attention, the request of Amicus Los Angeles County to reconsider our order dismissing it as a named petitioner in the case. Our order is reaffirmed for lack of jurisdiction under 26 U.S.C. § 3310(a).[13] We must also note that Amicus is represented by the same attorneys representing the State of New Hampshire Department of Employment Security. By use of the Amicus format, the petitioner has had an opportunity to present its constitutional arguments exhaustively from every conceivable angle.
 
 
 54
 LEVIN H. CAMPBELL, Circuit Judge (concurring).
 
 
 55
 Like my colleagues, I find substantial evidence to support the decision of the Secretary of Labor that New Hampshire's unemployment compensation law failed in six specific respects to conform to the 1976 federal amendments. See 26 U.S.C. § 3310(b). This being so, even if New Hampshire's constitutional challenge to the statutory provision requiring it to provide unemployment coverage to state and local employees were correct, the Secretary was nonetheless entitled to withhold funding. Given an adequate statutory ground upon which to uphold the Secretary's decision, I therefore believe it to be unnecessary and inappropriate to decide New Hampshire's constitutional challenge.
 
 
 56
 Under 26 U.S.C. § 3304(c), the Secretary is commanded by Congress to withhold certification from any state which the Secretary "finds has failed to amend its law so that it contains each of the provisions required by reason of the enactment of the Unemployment Compensation Amendments of 1976 to be included therein." (Emphasis added.) As I read this law, if the state's enactment fails to conform to the federal requirements in even one material respect, the Secretary is required to withhold certification. New Hampshire concedes that its law has not been amended to conform to the federal requirements, and that the law is deficient in six different areas. The state's constitutional challenge, however, relates to only two of these areas, those involving coverage for public employees. Even were we to find this part of the federal act unconstitutional, as New Hampshire urges, we would nevertheless be constrained to affirm the decision of the Secretary insofar as it rests on the four provisions of the 1976 amendments that are undoubtedly constitutional.[1]
 
 
 57
 As the Supreme Court has recently observed:
 
 
 58
 " 'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.' Spector Motor Co. v. McLaughlin, 323 U.S. 101, 105 (, 65 S.Ct. 152, 154, 89 L.Ed. 101). Before deciding (a) constitutional question, it (is) incumbent on . . . courts to consider whether . . . statutory grounds might be dispositive."New York Transit Authority v. Beazer, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979); see also Rescue Army v. Municipal Court, 331 U.S. 549, 568-69, 67 S.Ct. 1409, 1419, 91 L.Ed. 1666 (1947); Ashwander v. TVA, 297 U.S. 288, 346-47, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Since the statutory ground in this case is entirely dispositive, I see no reason to follow the parties into collateral issues. If New Hampshire wished a ruling on its point of constitutional law, it should first have conformed its laws in all respects not implicating the constitutional issue.
 
 
 59
 I would add that apart from the reasons given above for avoiding constitutional adjudication, I take no particular exception to the court's decision.
 
 
 
 *
 Of the District of New Hampshire, sitting by designation
 
 
 [1]
 We understand that this is the first appeal under 26 U.S.C. § 3310, which provides in pertinent part:
 (a) In general. Whenever under section 3303(b) or section 3304(c) the Secretary of Labor makes a finding pursuant to which he is required to withhold a certification with respect to a State under such section, such State may, within 60 days after the Governor of the State has been notified of such action, file with the United States court of appeals for the circuit in which such State is located or with the United States Court of Appeals for the District of Columbia, a petition for review of such action.
 
 
 [2]
 For a full discussion of the genesis of the unemployment insurance program and its statutory mechanism, see Carmichael v. Southern Coal Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937), and Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)
 
 
 **
 On June 23, 1979, New Hampshire enacted House Bill 808 in an attempt to conform with the 1976 FUTA amendments. We asked for briefs on the question of whether this legislation rendered the case moot. The State of New Hampshire, in a brief by its Attorney General, urged that the case was moot. The other parties, the Department of Labor, the State of New Hampshire Department of Employment Security, and the Amicus took the position that the case was not moot
 Our examination of the bill and subsequent events convince us that the case is not moot. House Bill 808 did provide a framework for bringing New Hampshire into conformity with FUTA. The legislation alone, however, could not bring New Hampshire into full compliance. Conforming rules and regulations had to be promulgated by the New Hampshire Department of Employment Security to flesh out the bare bones legislation. These required the approval of the Secretary of Labor. In addition, administrative action by New Hampshire was necessary to give such rules and regulations retroactive effect. The parties attempted for months to agree on the rules and regulations and administrative action for implementing House Bill 808 and bringing New Hampshire into conformity with the FUTA amendments. The State of New Hampshire and the Department of Labor did agree on conforming rules and regulations and a judgment was prepared embodying them. The New Hampshire Department of Employment Security, however, refused to approve the judgment agreed upon by the Department of Labor and the State. Since the judgment had to be implemented by the New Hampshire Department of Employment Security and since this department is completely autonomous, there can be no settlement without its approval.
 It must also be noted that House Bill 808's statement of purpose expresses clearly and forcibly the opinion of the New Hampshire Legislature that it had no other alternative but to accede to this "federal intrusion of its sovereignty" and that the legislation was enacted "under duress and for no other reason."
 
 
 [3]
 26 U.S.C. § 3310(b) provides in pertinent part:
 (b) Findings of fact. The findings of fact by the Secretary of Labor, if supported by substantial evidence, shall be conclusive(.)
 
 
 [4]
 "While there are obvious differences between the schools and hospitals involved in Wirtz, and the fire and police departments affected here, each provides an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens. We are, therefore, persuaded that Wirtz must be overruled." National League of Cities v. Usery, 426 U.S. 833, 855, 96 S.Ct. 2465, 2476, 49 L.Ed.2d 245 (1976)
 
 
 [5]
 The other four nonconformity findings are limited to the private sector. New Hampshire, in its latest brief, acknowledges its duty to conform to the 1976 amendments as they apply to the private sector, but argues that respondent Secretary waived these requirements pending resolution of the constitutional issue. The Secretary denied any waiver and argues that New Hampshire is precluded from asserting a waiver since it was not raised below. We find no evidence of a waiver by the Secretary
 
 
 [6]
 For purposes of this discussion, we include public school employees as employees of political subdivisions of the state. We are aware, of course, that in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court held that a local school board was not an arm of the state and, therefore, not entitled to invoke the bar of the eleventh amendment. Id. at 280-81, 97 S.Ct. at 572-73. We do not think, however, that this limitation applies to the tenth amendment
 
 
 [7]
 New Hampshire is the only state that has opted not to conform. It repeatedly stresses in its brief the burden on the state's employers if the Act is held constitutional. We observe that it is easy to gamble for high stakes when the money on the table comes from someone else's pocket
 
 
 [8]
 The categories of employees have expanded. Single employees are now covered. Federal civilian employees were included in 1954 with provisions to reimburse the states for the benefits paid and the administrative costs. In 1966, federal military personnel were covered. In 1970, conformity requirements were passed to extend coverage to employees of large nonprofit organizations and employees of state hospitals and state institutions of higher learning. The 1976 amendments extended the tax to farms which employ ten or more workers for certain time periods or pay at least $20,000 in wages in any calendar quarter. 26 U.S.C. § 3306(a)(2). Under 26 U.S.C. § 3306(a)(3), employers of domestic workers were included
 
 
 [9]
 Originally, FUTA was based on the total wages of each employee. In 1940, the tax was limited to the first $3,000 of each employee's wages. At present, the tax base is the first $6,000 of wages. Unemployment Compensation Amendments of 1976. The tax rate has gone from 3.0 percent to its present rate of 3.4 percent; the tax credit has remained constant at 2.7 percent
 
 
 [10]
 In the Emergency Unemployment Compensation Act of 1974, Congress extended emergency benefits for individuals who had exhausted their regular benefits during a period of high unemployment. Although emergency benefits were funded entirely by the federal government, only certified states could participate in the program. The Emergency Jobs and Unemployment Assistance Act of 1974 provided unemployment benefits for individuals generally not covered under the regular program, i. e., agricultural and domestic workers and employees of state and local governments. This program was fully funded by the federal government, but was payable only in areas designated by the Secretary of Labor during periods of high unemployment. During fiscal 1976, the federal government paid about 3.4 billion dollars in emergency benefits. U.S. Dept. of Labor, Sixty-Fourth Annual Report 12-13 (1976). Federal grants to the states for the administration of their unemployment compensation program amounted to over $900,000,000 for fiscal 1977. 1 House Hearings before SubComm. of Comm. on Appropriations, 95th Cong. 2d Sess. 191 (1978). When state reserves are insufficient to meet the need for benefit payments, the federal government through the unemployment trust fund lends the needed funds to the state. Such loans are interest free. As of February 1, 1978, there were outstanding loans to twenty-one states in the aggregate amount of $4.9 billion. 1 House Hearings, supra, at 168-69. Federal appropriations of FUTA tax receipts to the unemployment trust fund amounted to over $1.5 billion in fiscal 1976, and almost $2 billion in fiscal 1977. The Budget of the U.S., Fiscal Year 1978, App. 508; The Budget of the U.S., Fiscal Year 1979, App. 621
 
 
 [11]
 "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."
 
 
 [12]
 In reviewing the findings of the ALJ, the Secretary made the following conclusion of law, which we find to be correct. "Due to New Hampshire's base period and benefit year, all of the cost for FY 1978 and approximately one-half the cost for FY 1979 of extending coverage to state and local government employees could have been, at New Hampshire's option, covered by the Federal Government under the transition provision (Section 121) of the 1976 Amendments."
 
 
 [13]
 26 U.S.C. § 3310(a) provides in pertinent part:
 Whenever under section 3303(b) or section 3304(c) the Secretary of Labor makes a finding pursuant to which he is required to withhold a certification with respect to a State under such section, such State may, within 60 days after the Governor of the State has been notified of such action, file with the United States court of appeals for the circuit in which such State is located or with the United States Court of Appeals for the District of Columbia, a petition for review of such action.
 
 
 [1]
 I think it is plain that Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), would foreclose any attempt by the state to argue that the federal act is unconstitutional in its application to private employers. Four of the requirements to which New Hampshire's statute was found not to conform concerned private employers only. See discussion in majority opinion at p. 244