OPINION
 

 DEBEVOISE, District Judge.
 

 Plaintiffs challenge the constitutionality of recently enacted amendments to the Federal Unemployment Tax Act, 26 U.S.C. § 3301 et seq., and the New Jersey Unemployment Compensation Law, N.J.S.A. 43:21-1
 
 et seq.,
 
 the effect of which is to reduce the unemployment insurance benefits payable to individuals who simultaneously receive pension benefits, Social Security retirement benefits or other periodic payments attributable to previous work history. The matter is before the court on defendants’ motion to dismiss.
 
 [1]
 

 Plaintiffs, individuals whose unemployment benefits have been curtailed or eliminated by the amendments in question, bring this suit on behalf of themselves and all others similarly situated against John S. Horn, Commissioner of the New Jersey Department of Labor, Jerome Kurtz, Commissioner of the Internal Revenue Service and Ray Marshall, Secretary of Labor.
 
 [2]
 
 It is their contention that the federal amendment, 26 U.S.C. § 3304(a)(15), denies them equal protection of the laws and impairs the obligation of contracts in violation of the Fifth Amendment. They claim that the parallel state amendment, N.J.S.A. 43:21-5(a), denies them equal protection and due process of law, in violation of the Fourteenth Amendment, and impairs the obligation of contracts, in violation of Article 1, section 10 of the Constitution. Invoking pendent jurisdiction, plaintiffs further contend that N.J.S.A. 43:21-5a denies them equal protection and due process of law, in violation of Article 1, paragraph 1 of the New Jersey Constitution; impairs the obligation of contracts, in violation of Article 4, section 7, paragraph 3 of the New Jersey Constitution; and impermissibly discriminates on the basis of age, in violation of New Jersey’s Law Against Discrimination, N.J.S.A. 10:5-1 et seq. Plaintiffs seek the following remedies: a declaratory judgment that the federal and state amendments are unconstitutional and invalid; a preliminary and permanent injunction restraining defendants from effecting the unemployment insurance reductions prescribed by the amendments; and a retroactive award of benefits heretofore denied.
 

 Both the state and federal defendants join in a motion to dismiss for failure to state a claim. The federal defendants assert, as grounds for their motion, that: (1) plaintiffs lack standing to challenge the validity of the federal statute; (2) the action is barred in its entirety by the Tax Injunction Act, 28 U.S.C. § 1341; and (3) the legislation at issue violates neither the equal protection, due process nor contracts clauses of the Constitution. The state defendants join grounds (2) and (3) in support of their motion, but demur from the federal defendants’ contention that plaintiffs lack standing to challenge the federal amendment.
 

 
 *844
 
 I.
 
 Background
 

 A.
 
 The Federal-State “Cooperative” Unemployment Compensation Scheme
 

 The history and operation of the nation’s federal-state cooperative unemployment compensation scheme, first enacted as Title IX of the Social Security Act of 1935 and now codified as the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3301
 
 et seq.,
 
 have been described in detail on many occasions,
 
 see, e.g., Carmichael v. Southern Coal Co.,
 
 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937);
 
 Steward Machine Co.
 
 v.
 
 Davis,
 
 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937);
 
 State of New Hampshire Department of Employment Security v. Marshall,
 
 616 F.2d 240 (1st Cir. 1980), and need not be re-examined at length.
 

 For purposes of this case, it will suffice to observe that Congress created in 1935, through its taxing and spending powers, a comprehensive and uniform system of unemployment compensation.
 
 [3]
 
 The states had previously been reluctant to undertake such measures unilaterally, fearing that employers would flee to jurisdictions which did not impose similar taxes.
 
 Steward Machine Co. v. Davis, supra
 
 301 U.S. at 587 — 88, 57 S.Ct. at 891. Key to the Congressional program, therefore, was full participation by and uniformity among the states.
 

 Although the New Deal legislation has since been revised and recodified many times, its fundamental principles have not been substantially altered. The desired uniformity is now achieved in the following fashion.
 

 FUTA imposes a substantial federal excise tax upon the payrolls of private employers. The employer, however, is entitled to credit against the payroll tax up to 90% of any contributions made during the fiscal year to a certified state unemployment compensation fund. The state remits such contributions to the Secretary of the Treasury for inclusion in a federal Unemployment Trust Fund. When the need arises, the Secretary authorizes release of the Trust Fund monies to the state for payment of unemployment compensation benefits.
 

 In addition to receiving and disbursing monies for the payment of unemployment benefits, the Secretary of the Treasury is authorized to make payments to the states from both FUTA and general tax revenues to aid in the administration of certified state unemployment compensation programs. 42 U.S.C. §§ 501-504 and 1101(c)(1)(A). Also available to states with certified unemployment programs are federal funds for the maintenance of public, employment offices providing job placement, recruitment and other services to unemployed workers. 29 U.S.C. § 49
 
 et seq.
 
 As unemployment has increased in recent years, Congress has expanded the federal government’s commitment to states participating in the cooperative scheme by authorizing appropriations from general revenues for extended and supplemental unemployment benefits and for interest-free loans to state unemployment accounts. 26 U.S.C. § 3304 note.
 

 If a state is to receive the benefits of FUTA’s federal-state cooperative scheme, it must abide by federal rules. Congress has set forth in 26 U.S.C. § 3304(a) minimum federal criteria governing the conditions of eligibility and the manner in which state unemployment benefits are to be paid.
 
 [4]
 
 Unless the Secretary of Labor has certified the state’s unemployment program to be in substantial compliance with the provisions of § 3304(a) in a given taxable year, private employers are ineligible for any credits against the FUTA payroll tax on account of
 
 *845
 
 contributions made to the. state’s unemployment fund. Furthermore, the state itself is disqualified from receiving federal funds directed to the administration of its unemployment laws, maintenance of public employment offices, provision of supplemental and extended benefits and subsidization of its compensation fund. Whether a state does or does not qualify to receive the benefits of the FUTA program, its employers must still pay FUTA’s payroll tax.
 

 The federal defendants insistently urge that the states’ participation in the federal-state cooperative unemployment compensation scheme is purely voluntary because each state remains free at any time to enact non-conforming legislation and withdraw from the program.
 
 See State of New Hampshire Department of Employment Security v. Marshall, supra.
 
 This is undeniably true. The economic consequences of nonconformity to a state, its employers and its employees, however, are severe. The practical effect of the federal unemployment legislation, therefore, has been to create a substantially . uniform program throughout the nation, ruled by the guiding hand of Congress.
 
 [5]
 

 The State of New Jersey passed a statute conforming with the federal unemployment compensation law in 1936,
 
 see
 
 N.J.S.A. 43:21 — 1
 
 et seq.,
 
 and has been a full participant in the cooperative program since that time. »
 

 B.
 
 The Challenged Amendments
 

 Plaintiffs in the present action challenge the constitutionality of recently enacted amendments to FUTA and the New Jersey Unemployment Compensation Law relating to “disqualifying income.”
 

 Prior to 1970, FUTA imposed upon the states no specific guidelines for determining whether, and to what extent, unemployment compensation claimants should be disqualified from receiving full benefits if, despite their loss of work, they continued to receive “wage-replacement” income from alternative sources. Accordingly, many states chose to designate various forms of income as disqualifying income. By 1969, 46 states had enacted provisions for partially or completely reducing state unemployment compensation benefits to individuals receiving the following forms of alternative income: old age insurance benefits (16 states); payments pursuant to employer pension plans (33 states); workers’ compensation payments (23 states); wages in lieu of notice (33 states); and dismissal payments (20 states). Table ET-9,
 
 Comparison of State Unemployment Insurance Laws,
 
 United States Department of Labor, Manpower Administration, Unemployment Insurance Service (January, 1972) (Defendants’ Exhibit A).
 

 Congress tacitly approved these state provisions in section 122 of the Employment Security Amendments Act of 1970, Pub. L.No. 91-373, 84 Stat. 695 (1970), in which it referred to the concept of disqualifying income for the first time. In the 1970 amendment, Congress provided that:
 

 compensation shall not be denied to any individual . . . for any cause other than discharge for misconduct connected with his work, fraud in connection with a claim for compensation, or
 
 receipt of disqualifying income.
 

 26 U.S.C. § 3304(a)(10) (emphasis added).
 

 Although the federal law still did not require states to treat any particular forms of income as disqualifying income, this amendment acknowledged and implicitly approved earlier efforts by the states to establish their own rules in the area. Following the 1970 amendment, states continued to disqualify various forms of alternative income on a non-uniform basis.
 

 
 *846
 
 In 1976, Congress passed a FUTA amendment requiring participating states, , for the first time, to treat specific forms of “wage-replacement” income as disqualifying income. The amendment, codified as 26 U.S.C. § 3304(a)(15), conditions federal certification of a state’s unemployment compensation laws upon the state’s adoption of a provision that:
 

 [T]he amount of compensation payable to an individual for any week which begins after September 30, 1979, and which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or any other similar periodic payment which is based on the previous work of such individual shall be reduced (but not below zero) by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week.
 

 Unemployment Compensation Amendments of 1976, Pub.L.No. 94-566, 90 Stat. 2667 (1976).
 

 The practical effect of the amendment is to create, on a uniform basis throughout the United States, a dollar-for-dollar reduction of unemployment insurance benefits by income received from the designated “wage-replacement” sources. Although the amendment was originally scheduled to become effective on September 30, 1979, its effective date was subsequently extended to March 31, 1980. Pub.L.No. 95-19, 91 Stat. 39, 45 (1977).
 

 Shortly after § 3304(a)(15) became effective, Congress re-amended it to include the following additional language: except that—
 

 (A) the requirements of [the original version] shall apply to any pension, retirement or retired pay, annuity, or other similar periodic payment only if—
 

 (i) such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law), and
 

 (ii) in the case of such a payment not made under the Social Security Act or the Railroad Retirement Act of 1974 (or the corresponding provisions of pri- or law), services performed for such employer by the individual after the beginning of the base period (or remuneration for such services) affect eligibility for, or increase the amount of such pension, retirement or retired pay, annuity, or similar payment, and
 

 (B) the State law may provide for limitations on the amount of any such a reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment.
 

 ■ Section 414, Multiemployer Pension Plan Amendments Act of 1980, Pub.L.No. 96-364, 94 Stat. 1208 (September 26, 1980).
 

 The additional language alters the original amendment in two key respects. First, it limits the setoff requirement to those situations in which a single employer would otherwise be required to finance not only a claimant’s unemployment insurance benefits but also his pension benefits during the same “base period.” Second, it permits states to reduce the setoff by an amount representing the claimant’s own contributions to a pension plan or other form of wage replacement income.
 
 [6]
 

 Prior to the effective date of the original federal amendment, the New Jersey legislature passed a parallel amendment to the state unemployment compensation law for the express purpose of bringing “New Jer
 
 *847
 
 sey into conformity with FUTA, § 3304(a)(15) before March 31, 1980, at which time non-conformity would make New Jersey employers ineligible for Federal tax credits amounting to almost $500 million annually and the Department of Labor and Industry ineligible for administrative grants of approximately $60 million.” N.J. Laws 1980, c. 13, Notes. Aware that Congress was considering further amendments to § 3304(a)(15), New Jersey designed its conforming law with sufficient flexibility to incorporate the substance of the pending amendments. New Jersey’s setoff requirement, codified as N.J.S.A. 43:21-5a, now provides as follows:
 

 The amount of benefits payable to an individual for any week which begins in a period with respect to which such individual is receiving a governmental or other pension, retirement or retired pay, annuity, or other similar periodic payment which is based on the previous work of such individual shall be reduced, but not below zero, by an amount equal to the amount of such pension, retirement or retired pay, annuity, or other payment, which is reasonably attributable to such week; provided that, such reduced weekly benefit rate shall be computed to the next higher multiple of $1.00 if not already a multiple thereof and that any such reduction in the weekly benefit rate shall reduce the maximum total benefits of the individual during the benefit year; provided further, that, if the provisions of the Federal Unemployment Tax Act permit, the Commissioner of Labor and Industry may prescribe in regulations which are consistent with the Federal Unemployment Tax Act either or both of the following:
 

 a. The requirements of this section shall only apply in the case of a pension, retirement or retired pay, annuity, or other similar periodic payment under a plan maintained or contributed to by a base period or chargeable employer as determined under the chapter to which this act is a supplement;
 

 b. The amount of any such reduction shall be determined taking into account contributions made by the individual for the pension, retirement or retired pay, annuity or other similar periodic payment.
 
 [7]
 

 Plaintiffs in the present action mount a constitutional challenge on equal protection, due process and contracts clause grounds to both the federal and state amendments, 26 U.S.C. § 3304(a)(15) and N.J.S.A. 42:21-5a, in their current form.
 

 II.
 
 Standing
 

 The federal defendants initially argue that plaintiffs lack standing to sue any of the named federal officials or to challenge the federal amendment, but must seek redress at the hands of the state alone. The state defendants join plaintiffs in opposing this aspect of the federal defendants’ motion.
 

 “The essence of the standing inquiry,” the Supreme Court has held,
 

 is whether the parties seeking to invoke the court’s jurisdiction have “alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.”
 
 Baker v. Carr,
 
 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). As refined by subsequent reformulation, this requirement of a “personal stake” has come to be understood to require not only a “distinct and palpable injury” to the plaintiff,
 
 Warth v. Seldin,
 
 422 U.S. 490, 501 [95 S.Ct. 2197, 2206, 45 L.Ed.2d 343] (1975), but also “a fairly traceable” causal connection between the claimed injury and the challenged conduct.
 
 Arlington Heights v. Metropolitan Housing Dev. Corp.,
 
 429 U.S. 252, 261 [97 S.Ct. 555, 561, 50 L.Ed.2d 450] (1977).
 

 
 *848
 

 Duke Power v. Carolina Environmental Study Group,
 
 438 U.S. 59, 72, 98 S.Ct. 2620, 2630; 57 L.Ed.2d 595 (1978).
 

 The second branch of the standing inquiry, the “causal connection” requirement, has been alternatively formulated by the Supreme Court as a “redressability” requirement. “To satisfy the second prong of the constitutional standing requirement,” the Court has held, requires “no more than a showing that there is a substantial likelihood that the relief requested will redress the injury claimed.”
 
 Id.
 
 at 75, n. 20, 98 S.Ct. at 2631, n. 20;
 
 see also Simon v. Eastern Kentucky Welfare Rights Organization,
 
 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).
 
 [8]
 

 The federal defendants do not deny that plaintiffs’ loss of unemployment insurance benefits constitutes a sufficiently “distinct and palpable injury” to satisfy the first, or “injury in fact,” branch of the standing inquiry under Article III.
 
 See United States v. SCRAP,
 
 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Rather, they focus upon the second, or “causal connection,” branch. The federal defendants argue that it cannot be shown that a judicial mandate striking down the FUTA amendment would be “likely” to provide plaintiffs with redress, and therefore such a mandate would be a “gratuitous exercise of power inconsistent with the Article III limitation” of federal judicial power to cases or controversies.
 
 See Simon v. Eastern Kentucky Welfare Rights Organization, supra,
 
 426 U.S. at 38, 96 S.Ct. at 1924.
 

 For the reasons which follow, I find the federal defendants’ contention to be wholly without merit. Plaintiffs clearly have standing to attack both the federal and state amendments. Indeed, if plaintiffs lack standing to challenge the federal amendment, a successful challenge to the state amendment might well result in the loss to plaintiffs and all other New Jersey citizens of the entire state unemployment benefits program- — hollow redress indeed!
 

 As initially formulated, the federal defendants’ standing argument rests upon the proposition that judicial relief directed to the federal amendment, if the federal amendment alone were challenged, would be ineffective to provide plaintiffs with redress because the federal defendants have no power or authority to compel the states to comply with the provisions of the federal statute. Defendants argue that “New Jersey’s participation in FUTA is
 
 entirely vol
 
 untary” and that “the operative New Jersey setoff provision is the creatures [sic] of
 
 state legislative action alone.”
 
 From this proposition, they conclude that “an order by this Court against the Secretary of Labor could not redress the alleged reduction in New Jersey unemployment benefits to plaintiffs or any other state claimant.” (Federal Defendants’ Principal Brief at 27) (emphasis added).
 

 Defendants have marshalled substantial case law support for their contention that the “voluntary” nature of state participation in the cooperative FUTA scheme deprives state unemployment compensation claimants of standing to challenge Congressionally enacted amendments to the federal law, even when continued certification of state unemployment programs depends upon full compliance by the state with the federal amendments.
 
 See Ascension Lutheran Church v. Employment Security Commission of North Carolina,
 
 501 F.Supp. 843 (W.D.N.C.1980);
 
 Northern New England Conference of Seventh Day Adventists v. State of New Hampshire,
 
 525 F.Supp. 912 (D.N.H.1980);
 
 Northside Church of Christ v. Florida,
 
 No. 79-0705 (N.D.Fla. Jan. 2,1980);
 
 St. John Lutheran Church v. Giles,
 
 No. 78-1316 (N.D.Ohio 1979);
 
 cf. Steward Machine Co. v. Davis, supra,
 
 301 U.S. at 585-93, 57
 
 *849
 
 S.Ct. at 890-93;
 
 State of New Hampshire Department of Employment Security v. Marshall, supra; but see Cabais v. Egger,
 
 527 F.Supp. 498 (D.D.C.1981);
 
 Rivera v. Patino,
 
 524 F.Supp. 136 (N.D.Cal.1981);
 
 Grace Brethren Church v. State of California,
 
 .No. 79-93 (C.D.Cal. Sept. 21, 1979). I do not, however, find the cited cases persuasive.
 

 In order for plaintiffs to establish standing to sue the federal defendants, it is not necessary that they show a
 
 direct
 
 causal connection between the challenged conduct and the alleged injury. It is sufficient if the causal connection, though indirect, can be described as “fairly traceable.”
 
 Arlington Heights v. Metropolitan Housing Corp.,
 
 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). The Supreme Court has held that:
 

 When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was designed to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights . .. [although] it may make it substantially more difficult to meet the minimum requirements of Article III: to establish, that, in fact, the asserted injury was the consequence of the defendants’ actions or that prospective relief will remove the harm.
 

 Warth v. Seldin,
 
 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975).
 

 In order to demonstrate their standing, plaintiffs must show that the reduction in their unemployment benefits resulted in a “concretely demonstrable way” from the federal defendants’ allegedly unconstitutional conduct and that, absent passage of the federal amendment, there is a “substantial probability” that the challenged reduction would not have occurred.
 
 Id.
 
 at 504, 95 S.Ct. at 2208.
 

 It is beyond dispute that a “fairly traceable” causal connection exists between the enactment by Congress of § 3304(a)(15) and the subsequent enactment by the New Jersey legislature of N.J.S.A. 42:21-5a. Indeed, the legislative notes to the New Jersey amendment expressly reveal such a causal relationship:
 

 FUTA, § 3304(a)(15) provides that a state must reduce the amount of unemployment benefits payable to an individual by the amount of any public or private pension (including social security and railroad retirement benefits) . . .
 

 This bill is intended to bring New Jersey into conformity with FUTA, § 3304(a)(15) before March 31, 1980, at which time non-conformity would make New Jersey employers ineligible for Federal tax credits amounting to almost $500 million annually and the Department of Labor and Industry ineligible for admin-. istrative grants of approximately $60 million.
 

 The bill allows for maximum flexibility consistent with the proposals now under consideration in Congress by giving the Commissioner of Labor and Industry the power to promulgate regulations allowing for less stringent pension deduction provisions if this is permitted under future Federal legislation. .
 

 N.J.S.A. 43:21-5a, Note of Senate Labor, Industry and Professions Committee.
 

 Had the state failed to conform with the federal mandate, the Secretary of Labor would have been obliged to decertify its participation in the FUTA scheme. Without certification, the state’s employers would have become liable for millions of dollars in payroll taxes without the benefit of offsetting credits for payments made to the state unemployment fund. The economic consequences to the state would have been disastrous. Clearly, the state legislature had no realistic alternative other than full compliance with the federal amendment.
 

 It is equally clear that plaintiffs meet the “redressability” aspect of the standing inquiry. Plaintiffs need not demonstrate that an award of relief against the federal defendants will guarantee redress of their claimed injury; they need only show that the relief they request is likely to result in redress.
 
 Simon v. Eastern Kentucky Wei-
 
 
 *850
 

 fare Rights Organization, supra,
 
 426 U.S. at 38, 96 S.Ct. at 1924;
 
 see also Arlington Heights v. Metropolitan Housing Corp., supra,
 
 429 U.S. at 264, 97 S.Ct. at 562;
 
 Warth
 
 v.
 
 Seldin, supra,
 
 422 U.S. at 504, 95 S.Ct. at 2208;
 
 but of. Leeke v. Timmerman,
 
 - U.S. -•, 102 S.Ct. 69, 70 L.Ed.2d 65 (1981) (summary action);
 
 Linda R. S. v. Richard D.,
 
 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).
 

 Although it cannot be proven to a certainty that New Jersey would abandon the setoff provisions set forth in N.J.S.A. 42:21-5a if the federal amendment were struck down, any other outcome would be most improbable. It is true that § 3304 contains only the minimum requirements for state programs and that, absent the challenged federal amendment, the state would be free under the statute to retain the setoff provisions of § 5a without risk of losing federal contributions to the state unemployment coffers.
 
 See Rivera v. Patino, supra,
 
 at 140. Unlike other states, New Jersey has not enacted a “self-destruct” clause as part of its setoff legislation, automatically terminating the setoff provisions should the federal amendment become ineffective.
 
 See Cabais v. Egger, supra,
 
 at 501;
 
 Rivera v. Patino, supra,
 
 at 140, 142-143.
 

 Clearly, however, a determination by this court that the federal provision is unconstitutional would logically compel a parallel determination that the state provision is unconstitutional as well. The federal and state amendments are virtually identical and stand or fall under the same constitutional standards. If the federal amendment denies plaintiffs equal protection under the Fifth Amendment, the state amendment necessarily denies them equal protection under the Fourteenth Amendment. The same reasoning applies to plaintiffs’ claims founded upon due process and the impairment of contracts. It is simply unrealistic to suppose, therefore, that the state might continue to impose the challenged setoff requirements upon unemployment claimants, thereby denying plaintiffs redress, if the federal amendment is determined to be unconstitutional. There can be little doubt that it was Congress’ passage of § 3304(a)(15), together with the state’s conforming legislation, which “caused” the injury of which plaintiffs complained; and that a judicial determination that the federal amendment is unconstitutional would provide plaintiffs with the redress they seek.
 

 In their reply brief, defendants have subtly — but ineffectively — reformulated their standing argument. “Plaintiffs correctly note,” they concede, “that causation may be indirect and that a substantial likelihood of redress is sufficient.” Nevertheless, the federal defendants would require plaintiffs to leap yet another hurdle — one for which they have cited no support in the case law— in order to achieve standing against them.
 

 Defendants contend that plaintiffs have failed to address what they characterize as the key standing issue in this case: “whether jurisdiction should be exercised over federal defendants who can provide only incomplete redress since a challenge to the federal law cannot result in financial relief from the federal treasury, when standing exists to sue the state from which full and complete redress can be gained.” (Federal Reply Brief at 4). Defendants urge that “the instant matter can be fully adjudicated and complete redress accorded by challenging the New Jersey law without the necessity of suing the federal defendants.” “Where full and complete redress can be gained from one party . . .,” they urge, “but only partial redress may be gained from another .. . standing to sue the latter party is unnecessary and nonexistent.” (Federal Reply Brief at 4).
 

 It is clear, however, that plaintiffs may
 
 not
 
 achieve “full and complete redress” at the hands of the state defendants alone. If this court were to invalidate the state amendment but leave the federal amendment intact, it would effectively force the decertification of the state unemployment compensation program. Absent the setoff provisions required by § 3304(a)(15), the state unemployment benefits statute would no longer meet the minimum federal criteria for continued participation in the feder
 
 *851
 
 al-state cooperative program. If the state program were decertified, the state’s employers would be forced to turn over millions of dollars earmarked for unemployment compensation benefits to the federal government without receiving any corresponding credits for the payment of funds to the state unemployment compensation fund. Plaintiffs, far from achieving “full and complete redress” for their alleged injuries, might well cause the demise of the entire state unemployment compensation system. At the very-least, they would set into motion a drain of funds from the state to the ultimate detriment of all the states’ citizens.
 

 In arguing that plaintiffs can obtain full redress at the hands of the state defendants alone, the federal defendants have defined too narrowly the scope of the relief plaintiffs seek. Broadly conceived, plaintiffs seek an order restoring full unemployment benefits to them
 
 without otherwise altering the state unemployment compensation system.
 
 Defendants have unduly attempted to isolate one area of an integrated program and to limit judicial relief to that area alone without considering the effect of the relief upon the system as a whole.
 

 Plaintiffs’ suit is akin to a suit against two individuals, each of whom holds one-half of the total combination to a safe. An order directing one defendant or the other to reveal his half of the combination alone will not open the safe, and would arguably be a “gratuitous” exercise of federal judicial power.
 
 See Simon v. Eastern Kentucky Welfare Rights Organization, supra,
 
 426 U.S. at 38, 96 S.Ct. at 1924. An order directing both defendants to reveal their respective halves of the combination would, however, permit the opening of the safe. Here, the federal defendants do not have the authority to grant plaintiffs the full relief they seek if they were sued alone; nevertheless, they must be joined as parties defendant if plaintiffs are to obtain effective redress of their alleged injury.
 
 See California Dept. of Human Resources v. Java,
 
 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971), in which the United States Supreme Court, after ruling that a provision of the California unemployment compensation act previously approved by the Secretary of Labor “must be enjoined” because of inconsistency with federal law, commented, “[i]n disposing of the prayer for a permanent injunction, it may be appropriate to join the Secretary of Labor as a party in order that complete relief may be accorded”, at 135, n.19.
 

 The federal defendants assert, in effect, that Congress may establish unconstitutional conditions for a state’s continued participation in a cooperative program, then insulate its action from judicial review by invoking the cloak of standing against the ultimate beneficiaries of the program. This notion, however, finds no support in the case law. It is well-established that Congress may not impose unconstitutional conditions upon the disbursement of benefits in a federal program.
 
 See Steward Machine Co. v. Davis, supra,
 
 301 U.S. at 590, 57 S.Ct. (at 892 (“We do not say that a tax is valid, when imposed by act of Congress, if it is laid upon the condition that a state may escape its operation through the adoption of a statute unrelated in subject, matter to activities fairly within the scope of national policy and power.”)
 
 See also Sherbert v. Verner,
 
 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (“It is too late in the day to doubt that [constitutional rights] may be infringed by the denial of or placing conditions upon a benefit or privilege.”);
 
 Speiser v. Randall,
 
 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958);
 
 see generally,
 
 L. Tribe,
 
 American Constitutional Law
 
 510 (1978). It is equally well-established that those who are ultimately injured when Congress imposes such unconstitutional conditions upon state participation in a federal-state cooperative program have standing to challenge the federal legislation.
 
 E.g., Harris v. McRae,
 
 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980);
 
 Rivera v. Patino, supra,
 
 at 142.
 

 For the foregoing reasons, the federal defendants’ motion for dismissal from the action on the ground that plaintiffs lack standing to sue them will be denied.
 

 
 *852
 
 III.
 
 The Tax Injunction Act
 

 All defendants argue that this court lacks subject matter jurisdiction to entertain plaintiffs’ complaint by reason of the Tax Injunction Act, 28 U.S.C. § 1341, which provides that:
 

 The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.
 

 Defendants make the following argument in support of their motion to dismiss pursuant to the Tax Injunction Act. State unemployment compensation benefits, they point out, are funded by a New Jersey tax levied upon employers’ payrolls. N.J.S.A. 43:21-7. The employer’s tax rate depends upon his “experience rating,” which is calculated as the ratio of his state unemployment fund contributions to the benefits paid from the fund. If fewer disbursements are made to the employees, the employer’s experience rating will improve and his tax liability will decrease. Thus, defendants conclude:
 

 New Jersey’s provision for setoff integrally affects the assessment of its employers’ state tax liability. Judicial interference with the New Jersey setoff provision would therefore necessarily and impremissibly [sic] interfere with the assessment of a state tax ...
 

 (Federal Defendants’ Reply Brief at 30).
 

 The purpose of the Tax Injunction Act is to prevent the disruption to a state’s revenue-gathering process occasioned by an injunction or declaratory judgment calling into question the validity of a state tax either on its face or as applied to an individual taxpayer.
 
 See Rosewell v. LaSalle National Bank,
 
 450 U.S. 503, 523, 101 S.Ct. 1221, 1234, 67 L.Ed.2d 464 (1981);
 
 Perez v. Ledesma,
 
 401 U.S. 82, 127-28, n. 17, 91 S.Ct. 674, 698-99, n. 17, 27 L.Ed.2d 701 (1970). The Supreme Court has held that § 1341 reflects and confirms the federal district court’s long-standing “equitable duty to refrain from interfering with a State’s collection of its revenue except in cases where an asserted federal right might otherwise be lost.”
 
 Tully v. Griffin, Inc.,
 
 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976). In particular, the Court has held, the act was “predicated upon the desirability of freeing, from interference by the federal courts, state procedures which authorize litigation challenging a tax only after the tax has been paid.”
 
 Great Lakes Dredge & Dock Co. v. Huffman,
 
 319 U.S. 293, 301, 63 S.Ct. 1070, 1074, 87 L.Ed. 1407 (1943).
 

 In the present action, plaintiffs do not challenge the validity of the state unemployment tax, nor do they seek to “enjoin, suspend or restrain its collection.” They merely challenge the manner in which their eligibility for benefits is calculated. If this court were to conclude that the setoff at issue is unconstitutional, plaintiffs would, it is true, become entitled to a higher level of benefits than they are now receiving. Through the automatic operation of the unemployment taxing formula, New Jersey’s employers would, in turn, be subjected to correspondingly higher tax assessments. At no point in the process, however, would the validity of the unemployment tax itself be brought into question. Furthermore, since the increase in revenues would take place automatically, there would be no interference at all with the state’s mechanism for gathering revenues. Simply because a federal court order would affect the
 
 amount
 
 of taxes collected by the state pursuant to a particular program does not mean that the court thereby
 
 interferes
 
 with the state’s tax-gathering function.
 
 [9]
 

 Defendants have cited a number of cases in which federal courts have declined to
 
 *853
 
 entertain challenges to FUTA amendments in reliance upon the Tax Injunction Act. E.g.,
 
 Ascension Lutheran Church v. Employment Security Commission of North Carolina,
 
 501 F.Supp. 843 (W.D.N.C.1980);
 
 Harvest Baptist Temple v. Commonwealth of Kentucky,
 
 No. 79-0620 (W.D.Ky. May 16, 1980);
 
 Northside Church of Christ v. Florida,
 
 No. 79-0705 (N.D.Fla. Jan. 2, 1980);
 
 Independent Baptist Church v. State of Tennessee,
 
 468 F.Supp. 71 (E.D.Tenn.1978). Each of the cited cases, however, was brought by a
 
 taxpayer
 
 seeking to enjoin the assessment of a state unemployment tax. These actions directly implicated the state’s interest in avoiding interference with its collection of taxes and, unlike the present case, fell squarely within the scope of § 1341.
 

 The federal courts routinely entertain challenges to state laws, policies, practices and procedures which, if successful, would require the state to make additional expenditures and, in the long run, to raise additional revenues in order to fund those expenditures. As the Supreme Court held in
 
 Shapiro v. Thompson,
 
 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969), a state “may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious discrimination between classes of its citizens. . . The saving of welfare costs cannot justify an otherwise invidious classification.”
 
 See also New Jetsey Welfare Rights Organization v. Cahill,
 
 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973);
 
 Goldberg v. Kelly,
 
 397 U.S. 254, 265-66, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970). If the Tax Injunction Act were deemed to bar such actions simply because a successful outcome might result in an increase in taxes collected by the state, the federal courts’ role as a forum for the vindication of federal statutory and constitutional rights would be largely gutted. Where, as here, no challenge is made to the validity of the tax itself, and a decision favorable to plaintiffs would have only a tangential effect upon the state’s revenue-gathering function, it is clear that the Tax Injunction Act does not apply.
 
 See Rivera v. Patino,
 
 524 F.Supp. 136 (N.D.Cal.1981).
 

 For the foregoing reasons, defendants’ motion to dismiss on the ground that this action is barred by the Tax Injunction Act will be denied.
 

 IV.
 
 Equal Protection
 

 Plaintiffs claim that the recently enacted federal and state setoff legislation, by treating unemployment claimants who receive “pension” income more harshly than unemployment claimants who receive other forms of alternative income, creates an irrational and invidious classification in violation of the Fifth and Fourteenth Amendments to the Constitution. Defendants move to dismiss this count of the complaint for failure to state a claim upon which relief may be granted.
 
 [10]
 
 ,
 
 [11]
 

 In order to evaluate plaintiffs’ equal protection claims, it is necessary first to determine the appropriate standard of review. Recent decisions by the Supreme Court and the Third Circuit Court of Ap
 
 *854
 
 peals have set forth less than fully consistent guidelines for analyzing equal protection claims. Determining the proper standard to apply here, therefore, is not an easy task.
 

 The Supreme Court has consistently held that “equal protection analysis requires strict scrutiny of a legislative classification only when the classification interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class.”
 
 Massachusetts Board of Retirement v. Murgia,
 
 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976);
 
 see also San Antonio School Dist. v. Rodriguez,
 
 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). The classifications the Court has identified as “suspect” include those based upon race, nationality and alienage.
 
 See Graham v. Richardson,
 
 403 U.S. 365, 371-72, 91 S.Ct. 1848, 1851-52, 29 L.Ed.2d 534 (1971).
 

 In a relatively small group of cases, the Court has employed an “intermediate” level of scrutiny. Under this standard, a challenged classification is upheld only if it “serves important governmental objectives and [is] substantially related to the achievement of these objectives.”
 
 Califano v. Webster,
 
 430 U.S. 313, 316-17, 97 S.Ct. 1192, 1194-95, 51 L.Ed.2d 360;
 
 see also Craig
 
 v.
 
 Boren,
 
 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). The Supreme Court has thus far applied an intermediate level of scrutiny to classifications based upon sex,
 
 e.g., Michael M. v. Superior Court of Sonoma County,
 
 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981);
 
 Wengler v. Druggists Mutual Insurance Co.,
 
 446 U.S. 142, 150,100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980), and illegitimacy, e.
 
 g., Lalli v. Lalli,
 
 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978);
 
 Mathews v. Lucas,
 
 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976).
 

 Where social and economic legislation which neither creates “suspect” or “quasi-suspect” classifications nor impinges upon fundamental rights is challenged on equal protection grounds, the Court has traditionally applied a “rational basis” test. Under this “relatively relaxed” or “minimal scrutiny” standard, legislation is upheld if it “classifies] the persons it affects in a manner rationally related to legitimate governmental objectives.”
 
 Schweiker v. Wilson,
 
 450 U.S. 221, 230-34, 101 S.Ct. 1074, 1080-1082, 67 L.Ed.2d 186 (1981).
 

 Because the federal and state unemployment compensation amendments challenged in this action impinge upon no fundamental interest,
 
 see Ohio Bureau of Employment Services v. Hodory,
 
 431 U.S. 471, 489, 97 S.Ct. 1898, 1908, 52 L.Ed.2d 518 (1977), and do not create any classification which the Supreme Court has recognized to be “suspect”,
 
 see Massachusetts Board of Retirement v. Murgia,
 
 427 U.S. 307, 313-14, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976), the standard of review which would ordinarily be applied is one of minimal scrutiny. Relying upon the recent case of
 
 Medora v. Colautti,
 
 602 F.2d 1149 (3d Cir. 1979), however, plaintiffs argue that a level of scrutiny more exacting than the rational relationship test routinely applied by the Supreme Court is appropriate here.
 

 In
 
 Medora,
 
 the Third Circuit Court of Appeals suggested that some legislative classifications ordinarily reviewable under the “rational relationship” test should be subjected to more careful examination. Confronted with an equal protection challenge to a state regulation which denied state welfare benefits to anyone found to be blind, aged or disabled under the federal SSI program, whether or not that person was actually eligible for SSI benefits, the
 
 Medora
 
 court employed a standard it la-belled “close scrutiny of rationality” and struck the regulation down. The court identified three factors which required a stricter scrutiny than the ordinary “rational relationship” test. The challenged regulation involved the distribution of welfare benefits, not a “fundamental” but an “important” right; it entailed a “denial of all aid rather than allocation of amounts of aid”; and its classification was based upon the “sensitive” if not “suspect” categories of age, blindness and disability.
 
 Id.
 
 at 1154.
 
 Medora
 
 creates a new category of equal protection scrutiny not yet recognized by
 
 *855
 
 the Supreme Court. The Third Circuit has since declined, however, to extend the decision beyond its narrow facts.
 
 See Jackson v. O’Bannon,
 
 633 F.2d 329, 339 (3d Cir. 1980).
 

 On the strength of
 
 Medora,
 
 plaintiffs argue that an intermediate level of scrutiny should be applied in this case because the challenged amendments to the federal-state unemployment compensation scheme “operate to the disadvantage of” the elderly. The
 
 Medora
 
 case, however, is readily distinguishable and does not control here. The government benefits affected by the legislation in this case are not welfare but unemployment benefits. Unlike welfare benefits, unemployment benefits are directed primarily to those who are, by definition, employable and are distributed on the basis of factors other than pure need. Moreover, the amendments challenged here do not, in most cases, deny aid altogether. They merely reduce a claimant’s unemployment benefits by an amount equal to his pension or social or security income and, by design, render no claimant pennileás. Finally, while it may be true that the challenged amendments have a particularly adverse impact upon the elderly, inasmuch as the elderly are more likely to be recipients of-the types of income the statute disqualifies, the classification is not drawn directly on lines of age. There are some elderly unemployed persons who receive income from alternative sources, such as annuities or dividends, which is not disqualified by the amendments. Conversely, there are some unemployed persons who receive disqualifying pension income but are not so old that they can reasonably be characterized as elderly. The amendments’ adverse effect upon the elderly is at best “indirect.”
 
 See Schweiker v. Wilson, supra,
 
 450 U.S. at 230-34, 101 S.Ct. at 1080-1082.
 

 Plaintiffs also suggest that a legislative classification which has a detrimental impact upon the elderly should be subjected to an intermediate level of scrutiny because age, like sex, is an “immutable” characteristic and because the elderly are frequent victims of “economic and social discrimination similar to that faced by women.” The Supreme Court has, however, explicitly rejected this argument and applied a rational relationship standard of review to classifications based upon old age.
 
 Massachusetts Board of Retirement v. Murgia, supra.
 
 In
 
 Murgia,
 
 the Court observed that:
 

 While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not experienced a “history of purposeful unequal treatment” or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities. . . [0]ld age does not define a “discrete and insular” group ... in need of “extraordinary protection from the majoritarian political process.” Instead, it marks a stage that each of us will reach if we live out our normal span.
 
 Id.
 
 427 U.S. at 313 — 14, 96 S.Ct. at 2566.
 

 The Court then proceeded to apply the “rational-basis standard” to a state statute which made a direct classification on the basis of age and, finding such a basis, upheld the statute’s constitutionality.
 
 See also Vance v. Bradley,
 
 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979);
 
 Malmed
 
 v.
 
 Thornburgh,
 
 621 F.2d 565, 570 (3d Cir. 1980).
 

 In light of the Supreme Court’s clear holding in
 
 Murgia
 
 that old
 
 age
 
 is not a “suspect” classification, and notwithstanding the Third Circuit’s limited deviation from traditional equal protection analysis in
 
 Medora,
 
 I conclude that the appropriate standard of review in this action is one of minimal scrutiny.
 

 Drawing extensively upon the legislative history of the 1976 amendment to FUTA, defendants identify three legislative goals which they contend are legitimate and rationally advanced by 28 U.S.C. § 3304(a)(15) and N.J.S.A. 43:21-5a: (i) promoting the financial integrity and viability of the unemployment compensation fund by reducing an unnecessary drain upon the fund’s resources; (ii) eliminating
 
 *856
 
 the duplicative payment of unemployment benefits to those who, by virtue of their eligibility for retirement, are receiving adequate alternative wage-replacement income and are less likely to re-enter the labor market; and (iii) promoting uniformity in the treatment of disqualifying income among states participating in the cooperative FUTA scheme.
 
 See generally,
 
 S.Rep.No. 94 — 1265, 94th Cong., 2d Sess., 21-22 (1976) U.S.Code Cong. & Admin. News 1976, p. 5997;
 
 Proposed Unemployment Compensation Amendments of 1976: Hearings on H.R. 10210 Before the Senate Finance Committee,
 
 94th Cong., 2d Sess., 51 (1976).
 
 [12]
 

 Plaintiffs do not directly dispute the
 
 legitimacy
 
 of the first and second legislative goals identified by defendants,
 
 cf. U.S. Dept. of Agriculture
 
 v.
 
 Moreno,
 
 413 U.S. 528, 534, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973), and, in light of a battery of Supreme Court precedent sustaining the legitimacy of such goals, could not reasonably do so.
 
 See Ohio Bureau of Employment Services v. Hodory, supra,
 
 431 U.S. at 493, 97 S.Ct. at 1910 (“It is clear that protection of the fiscal integrity of the [unemployment compensation] fund is a legitimate concern of the State.”);
 
 United States Railroad Retirement Board v. Fritz,
 
 449 U.S. 166 at 177, 101 S.Ct. 453 at 460, 66 L.Ed.2d 368 (Congress may legitimately eliminate “windfall” benefits for all or a portion of those who receive them);
 
 Richardson v. Belcher,
 
 404 U.S. 78, 82, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971) (Where workmen’s compensation and disability insurance programs “in certain instances served a common purpose,” Congress could legitimately offset the state workmen’s compensation benefits against federal disability benefits). Rather, they argue that the
 
 means
 
 chosen by Congress to effectuate these goals is irrational.
 

 Plaintiffs contend that the lines drawn by Congress in 28 U.S.C. § 3304(a)(15) and echoed by New Jersey in N.J.S.A. 43:21-5a are arbitrary and irrational. In particular, they urge, the amendments create:
 

 an irrational distinction between pension and other sources of income for unemployment compensation recipients. The classification offsets pensions but ignores other income. To consider one (1) source of income, namely pensions, and not other and probably more profitable sources of income,
 
 i.e.
 
 rents, investment income, etc., is totally irrational. Such treatment practically guarantees that those who need unemployment benefits the most, people with small pensions, will not get them thereby frustrating the purpose of the unemployment compensation law. (Plaintiffs’ Brief at 29-30).
 

 Plaintiffs further argue that the amendments fail to differentiate between periodic-payment pensions and lump-sum pensions. The latter, they point out, do not give rise to an unemployment compensation offset under § 3304(a)(15). as enacted although they serve substantially the same purpose. Finally, plaintiffs contend, the amendments fail to distinguish between private pension income and Social Security income. “To assert that Social Security benefits be treated the same as private pensions,” they assert, “is to ignore the inherent differences between the two.” Plaintiffs’ Brief at 30.
 

 Merely because the lines drawn by Congress in § 3304(a)(15) may be less than perfect, however, does not, in and of itself, serve to invalidate the entire legislation. The Supreme Court has consistently held that:
 

 A legislature may address a problem “one step at a time,” or even “select one phase of one field and apply a remedy there,
 
 *857
 
 neglecting the others.”
 
 Williamson v. Lee Optical Co.,
 
 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563] (1955). So long as its judgments are rational and not invidious, the legislature’s efforts to tackle the problems of the poor and needy are not subject to a constitutional straitjacket. The very complexity of the problem suggests that there will be more than one constitutionally permissible method of solving them.
 

 Jefferson v. Hackney,
 
 406 U.S. 535, 546-47, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972);
 
 see also Minnesota v. Clover Leaf Creamery Co.,
 
 449 U.S. 457, 726,101 S.Ct. 715, 66 L.Ed.2d 659 (1981);
 
 Schweiker v. Wilson, supra,
 
 450 U.S. at 235, 101 S.Ct. at 1083.
 

 Where the challenged drawing of lines involves the distribution of government benefits, the Supreme Court has suggested that it is particularly inappropriate for the courts to substitute their judgment or policy preferences for those of the legislature. In
 
 U.S. Railroad Retirement Board v. Fritz, supra,
 
 449 U.S. at 179, 101 S.Ct. at 461, the Court held that:
 

 The “task of classifying persons for ... benefits . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line,”
 
 Mathews v. Diaz,
 
 426 U.S. 67, 83-84 [96 S.Ct. 1883, 1893, 48 L.Ed.2d 478] (1976), and the fact that the line might have been' drawn differently at some points is a matter for legislative, rather than judicial, consideration.
 

 As long as Congress has not achieved its stated purposes in a “patently arbitrary or irrational way,” therefore, the amendments’ validity under the Equal Protection Clause must be sustained despite the drawing of lines which might seem unfair.
 
 Id.
 
 at 177, 101 S.Ct. at 460.
 

 There can be little doubt that the setoff Congress created in § 3304(a)(15) fulfills its purposes of eliminating duplicative benefits and preserving the fiscal integrity of the unemployment compensation in a rational manner. States have long disqualified various forms of wage-replacement income, including both pension and old-age insurance income, in computing unemployment benefits.
 
 See
 
 pp. 851-852,
 
 supra.
 
 Congress placed its imprimatur upon this practice in the Employment Security Amendments Act of 1970.
 
 See
 
 26 U.S.C. § 3304(a)(10). The disqualification of alternative forms of wage-replacement income reflects a reasonable legislative determination that those with outside income have a lesser need for governmental assistance during a period of unemployment and can best bear the brunt of government economies.
 

 In § 3304(a)(15), Congress simply singled out one category of alternative wage-replacement income for a uniform offset. Its focus upon pension and Social Security income reflected, in part, a determination that those who are eligible for retirement benefits are less likely than others to return to the labor force following a period of unemployment, and hence at some remove from the unemployment program’s principal purpose of providing crucial economic assistance during a job search. While this assumption may not be accurate in every instance, it is nevertheless a reasonable one that Congress was entitled to make.
 
 See U.S. Railroad Retirement Board v. Fritz, supra,
 
 at 178, 101 S.Ct. at 460. Defendants also point out that Congress offset only those dual benefits which were funded by the same employer during the same “base period.” Congress could reasonably conclude that such duplicative benefits cast an onerous burden upon employers and constituted a particularly troublesome form of “double dipping.” Finally, the reasonableness of Congress’ offset provision is underscored by its efforts to ensure that the provision would not reduce a claimant’s total income below that which he would receive were he entitled to unemployment compensation benefits alone. The amendment is aimed directly at eliminating the payment of benefits which can be described as “windfall” benefits.
 
 See U.S. Railroad Retirement Board v. Fritz, supra.
 

 Plaintiffs argue, with some cogency, that the creation of uniformity among the states
 
 *858
 
 cannot, in and of itself, be a legitimate goal of Congress in amending a federal-state cooperative scheme if the amendment itself does not survive judicial scrutiny. If the amendment does rationally further independent legitimate aims, however, as does the legislation at issue here, the promotion of uniformity constitutes an additional goal which may legitimately be pursued by Congress. Congress has long tolerated the creation of pension and social security offsets against unemployment benefits by participating states. By means of this amendment, it has achieved the goal of placing all states on an equal basis.
 
 See Steward Machine Co. v. Davis, supra.
 

 For the foregoing reasons, I conclude that the challenged state and federal amendments, while they concededly draw lines between similarly situated individuals, are not so “patently arbitrary or irrational” as to violate the equal protection components of the Fifth and Fourteenth Amendments. Defendants’ motion to dismiss plaintiffs’ equal protection claims will therefore be granted.
 

 V.
 
 Due Process
 

 Plaintiffs also claim that the challenged federal and state amendments to the unemployment compensation laws violate the Due Process Clauses of the Fifth and Fourteenth Amendments because they create an “irrebuttable presumption” that “all recipients of Social Security are retired from the workforce, when in fact many recipients are bona fide members of the workforce.”
 
 Cf. Cleveland Board of Education v. La Fleur,
 
 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974);
 
 Vlandis v. Kline,
 
 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).
 

 In the past, the Supreme Court has struck down legislation under the Due Process Clause which denies government benefits on the basis of a presumption not universally true without granting the claimant an opportunity to rebut the presumption.
 
 See Vlandis v. Kline, supra,
 
 at 452, 93 S.Ct. at 2236. It is now well-established, however, that where, as here, social and economic legislation is challenged which neither creates “suspect” classifications nor burdens fundamental rights, the proper standard of review under the Due Process Clauses of the Fifth and Fourteenth Amendments is the same as the standard applied under the Fourteenth Amendment’s Equal Protection Clause.
 
 Jackson v. O’Bannon,
 
 633 F.2d 329, 339 (3d Cir. 1980);
 
 see also Weinberger v. Salfi,
 
 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975);
 
 Hopkins
 
 v.
 
 Kelsey-Hayes, Inc.,
 
 628 F.2d 801 (3d Cir. 1980);
 
 Malmed v. Thornburgh,
 
 621 F.2d 565 (3d Cir. 1980);
 
 cf. U.S. Railroad Retirement Board v. Fritz, supra,
 
 449 U.S. at 173, n. 8, 101 S.Ct. at 458 n. 8.
 

 An “irrebuttable presumption” creates, in effect, a legislative rule or classification. If the classification is found to be motivated by a rational assumption held by the legislature for purposes of equal protection review, it will also pass muster under the Due Process Clause. As the Supreme Court held in
 
 Weinberger v. Salfi, supra,
 
 422 U.S. at 768, 95 S.Ct. at 2468, “the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification.”
 

 Here, a legislative rule has been created which reduces the unemployment benefits payable to those who simultaneously receive pensions or Social Security income. The legislative history clearly indicates that the rule was motivated, at least in part, by a Congressional concern that those who are eligible to receive “retirement” income during a layoff period are less likely to return to the workforce than those who do not, and hence are less needful of unemployment benefits. It may be that this “rule” or presumption is not universally true. As long as it reflects a reasonable assumption on the part of Congress, however — and I have already held that it does — it cannot be said to be so “patently arbitrary” or “utterly lacking in rational justification” as to violate the Due Process Clause.
 

 For the foregoing reasons, defendants motion to dismiss plaintiffs’ due process claims will be granted.
 

 
 *859
 
 VI.
 
 Impairment of Contracts
 

 Plaintiffs’ final federally-based contention is that the challenged amendments impair the obligation of contracts, in violation of Article 1, section 10 of the Constitution and the Fifth Amendment. The “contract” alleged to have been impaired is one created by the State of New Jersey with the workers of the state “to set aside certain monies contributed by employer and employee ‘to be used for the benefit of persons unemployed after qualifying periods of employment.’ N.J.S.A. 43:21-2.” (Plaintiffs’ Brief at 33).
 

 The Supreme Court has consistently held that public benefit programs created by statute and covering a- broad number of recipients do not create the type of expectation protected by the Contracts Clause and “may be altered or even eliminated at any time,” provided the minimum requirements of due process are met.
 
 See U.S. Railroad Retirement Board v. Fritz, supra
 
 (railroad retirement benefits);
 
 Richardson v. Belch-er,
 
 404 U.S. 78, 80, 92 S.Ct. 254, 256, 30 L.Ed.2d 231 (1972) (Social Security benefits). The Supreme Court’s rationale for denying contractual status to contributory public benefit programs has been set out most fully in
 
 Flemming v. Nestor,
 
 363 U.S. 603, 608-611, 80 S.Ct. 1367, 1371, 4 L.Ed.2d 1435 (1960), in which the Court first held that Social Security benefits are not protected by the Contracts Clause:
 

 We think that the District Court erred in holding that [a Congressional statute terminating the payment of Social Security benefits to deported aliens] deprived appellee of an ‘accrued property right.’ . . . Appellee’s right to Social Security benefits cannot properly be considered to have been of that order . . .
 

 The Social Security system may be accurately described as a form of social insurance . . . Plainly the expectation is that many members of the present productive work force will in turn become beneficiaries rather than supporters of the program. But each worker’s benefits, though flowing from the contributions he made to the national economy while actively employed, are not dependent on the degree to which he was called upon to support the system by taxation
 

 That program was designed to function into the indefinite future, and its specific provisions rest on predictions as to expected economic conditions which must inevitably prove less than wholly accurate, and on judgments and preferences as to the proper allocation of the Nation’s resources which evolving economic and social conditions will of necessity modify.
 

 To engraft upon thé Social Security system a concept of ‘accrued property rights’ would deprive it of the flexibility and boldness in adjustment to ever-changing conditions which it demands .. . It was doubtless out of an awareness of the need for such flexibility that Congress included in the original Act, and has since retained, a clause expressly reserving to it ‘[t]he right to alter, amend or repeal any provision’ of the Act. That provision makes express what is implicit in the institutional needs of the program.
 

 Plaintiffs attempt to distinguish unemployment compensation benefits from Social Security benefits on the ground that Social Security and other “government sponsored retirement benefit programs” require “no active participation by the pensioner other than contribution,” while the unemployment scheme requires that, “as a condition precedent to eligibility for benefits each person must agree to register for work and actively seek work, N.J.S.A. 43:21 — 4a and c.” This distinction, however, is vastly outweighed by the numerous similarities between the two programs.
 

 Like the Social Security program, the unemployment compensation scheme “was designed to function into the indefinite future”; contains provisions which “rest on predictions as to expected economic conditions which must inevitably prove less than wholly accurate, and on judgments and preferences as to the proper allocation of the Nation’s resources which evolving economic and social conditions will of necessity modify”; and pays benefits which “are not
 
 *860
 
 dependent on the degree to which [the recipient] was called oh to support the system by taxation.”
 
 See Flemming v. Nestor, supra.
 
 Moreover, both the federal and state unemployment compensation laws contain the express proviso that the legislature may “amend or repeal such law at any time,” 26 U.S.C. § 3304(a);
 
 accord
 
 N.J.S.A. 43:21-22, indicating a clear Congressional intent that no vested rights were intended to accrue.
 

 Although no case has been cited which holds that unemployment benefits are or are not contractual in nature, the logic of
 
 Flemming
 
 compels the conclusion that they are not, and that the protections of the Contracts Clause do not apply. I conclude, therefore, that plaintiffs have failed to state a claim under Article 1, section 10 or the Fifth Amendment to the Constitution and will grant defendants’ motion to dismiss this aspect of plaintiffs’ complaint.
 

 VII.
 
 Remaining Issues
 

 Plaintiffs’ remaining claims, premised upon pendent jurisdiction, involve state law only. The New Jersey offset amendment, N.J.S.A. 43:21 — 5a, plaintiffs contend, violates both the New Jersey Constitution and New Jersey’s Law Against Discrimination, N.J.S.A. 10:5-1
 
 et seq.
 
 In view of the fact that I have dismissed plaintiffs’ federal claims before trial, I will decline to exercise pendent jurisdiction over the state claims.
 
 See United Mine Workers v. Gibbs,
 
 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).
 

 Plaintiffs have moved for certification of this action as a class action. Since I have dismissed plaintiffs’ entire complaint on the pleadings, however, it is unnecessary to address the class certification motion. All remaining motions filed in this action have been rendered moot.
 

 The attorney for the federal defendants is requested to submit a form of order consistent with the rulings of this opinion.
 

 [1]
 

 . Defendants originally moved, in the alternative, for summary judgment but withdrew their request for summary relief prior to argument.
 

 [2]
 

 . Defendants have also moved, pursuant to Federal Rules of Civil Procedure 25(d), to substitute Roscoe Egger for Jerome Kurtz and Raymond Donovan for Ray Marshall. The caption will be deemed amended accordingly, without need for a formal order, pursuant to Rule 25(d).
 

 [3]
 

 . Congress was forced to rely upon a relatively complex combination of taxing and spending provisions to achieve its aims because its powers under the Commerce Clause had thus far been narrowly construed by the Supreme Court. See,
 
 e.g., Railroad Retirement Board v. Alton Railroad Co.,
 
 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). There is little doubt that Congress today could enact a nationwide unemployment compensation program directly under the Commerce Clause.
 
 See generally
 
 L. Tribe,
 
 American Constitutional Law
 
 §§ 5-4, 5-9, 5-10 (1978).
 

 [4]
 

 . This action challenges the constitutionality of one of those minimum criteria, 26 U.S.C. § 3304(a)(15).
 

 [5]
 

 . The federal defendants point out that “[c]onsiderable discretion has always been left each state to individually determine, among other matters, the requisite length of labor force attachment, the amount of earnings necessary to qualify for state benefits, the amount and duration of regular benefits, the state tax as well as experience rates and claimant-eligibility standards.” Defts. principal brief at 8. Whatever discretion the states may be afforded, however, the fact remains that a state must adhere to the minimum requirements of § 3304(a) if it is to remain in and enjoy the benefits of the FUTA program.
 

 [6]
 

 . According to the legislative notes of the New Jersey Senate’s Labor, Industry and Professions Committee, the original three-year delay in § 3304(a)(15)’s effective date was intended “to give the National Commission on Unemployment Compensation an opportunity to study the issue — and for the Congress to then act in light of its findings and recommendations.” The National Commission recommended against the setoff legislation, prompting Congress’s consideration and passage of these qualifying amendments in September, 1980. N.J. Laws 1980, c. 13, Notes.
 

 [7]
 

 . Section 2 of the amendment provided as follows: “This act shall take effect immediately, but shall remain inoperative until the date on which the Federal Unemployment Tax Act requires the State to comply with its pension deduction provisions in the same manner as is provided in this act.” N.J.S.A. 43:21-5a, note.
 

 [8]
 

 . Although the concepts of “causation” and “redressability” are not perfectly congruent, they appear to have been used by the Supreme Court interchangeably. The “causation” inquiry is retrospective in nature and would appear to be more appropriately applied in an action for money damages. The “redressability” inquiry is prospective and more appropriately applied in an action for injunctive relief. The two are related in the sense that only where some traceable causal connection exists between the conduct sought to be enjoined and the claimed injury will an injunction be “likely” to effectuate redress.
 

 [9]
 

 . Some courts have held that the Tax Injunction Act is not implicated when the validity of a state tax is challenged in federal court on the ground that it raises insufficient revenue, since the effect of a court order would be to
 
 increase
 
 rather than
 
 decrease
 
 state revenues.
 
 E.g., Appiing County v. Municipal Electric Authority of Georgia,
 
 621 F.2d 1301 (5th Cir. 1980). It is unnecessary to reach this issue here, however, as this action does not question the validity of a state tax at all.
 

 [10]
 

 . The state defendants join the federal defendants in arguing that the challenged state and federal legislation meets all federal constitutional requirements. They have not, however, moved or prepared briefs upon the additional question whether the challenged
 
 state
 
 amendment complies with the
 
 state’s
 
 constitution and laws. This opinion is limited to the federal law questions which defendants’ motion has put in issue.
 

 [11]
 

 . Plaintiffs have submitted affidavits in connection with this motion which, if considered, would require that the motion be treated as one for summary judgment.
 
 See Fed.R.Civ.Pro.
 
 12(b). The motion will be treated, however, purely as a motion to dismiss, and the materials submitted outside the pleadings will be excluded.
 

 The question then arises whether an equal protection challenge to state or federal legislation may properly be resolved on the pleadings.
 
 See Minnesota v. Clover Leaf Creamery Co.,
 
 449 U.S. 456, 464, n. 8, 101 S.Ct. 715, 724, n. 8, 66 L.Ed.2d 659 (1981). I conclude that where, as here, there is no challenge to the accuracy of legislative facts but only to the reasonableness of a legislative judgment, a decision on the pleadings is permissible.
 
 See Bayside Fish Flour Co. v. Gentry,
 
 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936).
 

 [12]
 

 . In the past term, the Supreme Court has been less than fully consistent as to whether a challenged classification may be sustained, under the rational relationship test, on any “conceivable basis,”
 
 see U.S. Railroad Retirement Board v. Fritz, supra,
 
 449 U.S. 166, at 179, 101 S.Ct. 453 at 461, 66 L.Ed.2d 368, or only on a basis which was “Congress’ deliberate, considered choice,”
 
 see Schweiker v. Wilson, supra,
 
 450 U.S. at 235, 101 S.Ct. at 1083.
 
 See generally Supreme Court Review and Constitutional Law Symposium,
 
 50 U.S.L.W. 2187 (1981). Since defendants’ arguments are amply reflected in the legislative history of the 1976 amendments, however, it is not necessary to reach this question here.