**HARVEY & HARVEY, INC., and Delaware Transfer Corp., Plaintiffs,**

**v.**

**DELAWARE SOLID WASTE AUTHORITY, a Delaware State Agency, and N.C. Vasuki, General Manager of the Delaware Solid Waste Authority, Defendants.**

Civ. A. No. 84–292–WKS.

United States District Court, D. Delaware.

Jan. 7, 1985.

**1370**

James McC. Geddes, Alicia B. Howard, Ashby, McKelvie & Geddes, Wilmington, Del., for plaintiffs.

F. Michael Parkowski, John W. Noble, Parkowski, Noble & Guerke, Dover, Del., for defendants.

## OPINION

STAPLETON, Chief Judge:

On May 23, 1984, Harvey & Harvey, Inc. ("Harvey & Harvey") and Delaware Transfer Corporation ("Transfer") initiated this declaratory judgment action against the Delaware Solid Waste Authority ("Authority") seeking to permanently enjoin the enforcement of certain portions of the proposed Delaware Solid Waste Authority Solid Waste Licensing and Disposal Regulations ("Regulations") governing solid waste disposal in the State of Delaware. Plaintiffs claim that the Regulations [1] violate both the Commerce Clause and the Equal Protection Clause of the United States Constitution. The Authority [2] has moved to dismiss on grounds that (1) the Eleventh Amendment insulates the Authority from suit, (2) this action is barred by the Tax Injunction Act, 28 U.S.C. § 1341, and (3) the complaint fails to state a claim upon which relief can be granted. In addition, the Authority has applied for a stay of this case pending resolution of parallel state proceedings.

### I. THE FACTS

#### A. *The Parties*

Harvey & Harvey and Transfer are both Delaware corporations engaged in the business of transporting solid waste. Harvey & Harvey hauls commercial and industrial

---

1. On June 21, 1984, the Authority adopted the proposed Regulations which became effective August 1, 1984.

2. On July 24, 1984, plaintiffs filed an amended complaint adding as a defendant, N.C. Vasuki

("Vasuki"), the general manager of the Authority. The Authority's motion to dismiss has been filed on behalf of both Vasuki and the Authority.

solid waste from various sites in New Castle County to disposal sites located both inside and outside the State of Delaware, as well as to a transfer station [3] located at Newport, Delaware, which it has owned and operated since May, 1982. The transfer station allows Harvey & Harvey to consolidate solid waste which it has collected for transportation to disposal sites, primarily out-of-state. Harvey and Harvey claims that additional benefits from utilizing the transfer station are that (1) it can take advantage of the longer operating hours at out-of-state disposal sites thereby increasing the volume of solid waste and the number of customers that it handles, and (2) it is better able to take advantage of the lower dumping fees at out-of-state disposal sites.

Transfer owns and operates a group of vehicles which are used to transport solid waste from the transfer station to both in-state and out-of-state disposal sites. Plaintiffs indicate that approximately 50% of Transfer's revenues come from fees charged to Harvey & Harvey for the transportation of solid waste, 95% of which is disposed of out-of-state. In addition, Transfer directly leases a large portion of its equipment to Harvey & Harvey.

The Authority is an agency created by the State of Delaware. It was established in 1975 pursuant to the adoption of the Delaware Solid Waste Authority Act ("Act"), 7 Del.C. §§ 6401, et seq. (1983). The Delaware General Assembly adopted the Act in response to growing concern over environmental degradation resulting from prevailing solid waste disposal practices and in recognition of the need for state-wide planning and coordination to aid

in the resolution of this solid waste disposal problem. 7 Del.C. § 6401(a) (1983).

The Act directs that the Authority shall develop a statewide solid waste management plan. In addition, it is charged with responsibility for the planning, design, management, ownership, and operation of solid waste disposal and resource recovery facilities and for the provision of solid waste management services. Since 1982, the Authority has had the power to control the flow of industrial and commercial solid waste. 7 Del.C. § 6406(a)(31) (1983) (as amended by 63 Del.Laws, c. 372 (1982)).[4] Section 6422(b) of the Act provides that the Authority "may by regulation require the owners or occupants of all lands, buildings and premises therein to use the services and facilities of the Authority under such rules and regulations as the Authority shall fix and establish."

N.C. Vasuki is the general manager of the Authority having responsibility for the execution and enforcement of the Regulations which are in question in this action.

## B. The Regulations

As provided for by Section 6403(l) of the Act, after notice and a public hearing, the Authority may adopt "rules and regulations to effectuate the powers, policies, purposes and functions" set forth in the Act. Pursuant to this power, the Authority has adopted solid waste licensing and disposal regulations. Although the Regulations are quite extensive, plaintiffs' challenges are limited to two narrow areas. Specifically, the portions of the Regulations under attack are Sections 4.01, 5.03, 9.01, 9.02, and 9.03.[5]

---

**3.** A transfer station is simply a facility used for consolidating waste collected from various sources for transport to disposal sites.

**4.** As originally adopted, the Act did not give the Authority control over the collection, transportation, storage, or transfer of garbage or refuse originating from residential, commercial, or industrial establishments. In 1977, the Authority was given the power to control the flow of residential solid waste. *See* 7 Del.C. § 6406(a)(31) (as amended by 61 Del.Laws, c. 132 (1977).

**5.** The Regulations in question provide in part as follows:

4.01 a. Except as otherwise provided in this Article:
(1) All solid waste generated within the State of Delaware shall be delivered to and disposed of at a Solid Waste Facility;
(2) The owners and occupants of all lands, buildings, and premises located within the State of Delaware, and all those persons acting for them or under contract with them, shall use only Solid Waste Facilities for the

Sections 4.01, 5.03, 9.02, and 9.03 generally require that all solid waste generated within the State of Delaware be disposed of at a "solid waste facility." That term is defined by the Regulations as "any landfill, recycling project, collection station, transfer station, or other solid waste processing or disposal facility or project operated by, on behalf of, or under contract with the Authority." The impact of this requirement is to force solid waste originating in Delaware to be disposed of in Delaware. These sections of the Regulations are the target of plaintiffs' Commerce Clause arguments. Section 9.01 requires a transfer station operator to document the source and final disposition of all solid waste processed by the transfer station. Plaintiffs challenge this provision as a violation of the Equal Protection Clause.

## II. ELEVENTH AMENDMENT IMMUNITY

The Authority contends that plaintiffs' claims for declaratory and injunctive relief must be dismissed as to the Authority since the Eleventh Amendment[6] prohibits the federal courts from entertaining suits by private parties against states and their agencies absent consent.[7] Plaintiffs do not dispute this general proposition but rather argue that the Delaware General Assembly has clearly waived any immunity which the Eleventh Amendment might have conferred on the Authority and, in the alternative, that the Authority is not the alter ego of the State of Delaware for purposes of Eleventh Amendment immunity.

It is clear that a state may waive its immunity under the Eleventh Amendment. *See, e.g., Pennhurst State School & Hosp. v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 907 (1984); *Petty v. Tennessee-Missouri Bridge Commission,* 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959); *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 882–83, 27 L.Ed. 780 (1883). However, "[t]he conclusion that there has been a waiver of immunity will not be lightly in-

---

disposal of solid waste generated within the State of Delaware.

b. Subject to the provisions of Sections 3.02 and 3.19 of these Regulations, solid waste generated within the State of Delaware shall be delivered to the following Solid Waste Facilities:

| Site of Generation | Disposal Facility |
|---|---|
| (i) New Castle County | Northern Solid Waste Facility Pigeon Point Lambson's Lane New Castle, Delaware |
| (ii) Kent County | Central Solid Waste Facility Del. Rt. 10 Sandtown, Delaware |
| (iii) Sussex County | Southern Solid Waste Facility Del. Rt. 20 Laurel, Delaware |

c. Persons delivering solid waste to a Solid Waste Facility shall pay to the Authority the applicable disposal fees and charges.

\* \* \* \* \* \*

9.01 Any person operating a transfer station for solid waste within the State of Delaware, shall:

a. prepare daily and maintain (for a minimum period of three years after preparation) records of the solid waste handled at the transfer facility showing the source and the final disposition of such waste after removal from transfer station, including address of such final disposition. The records to be maintained shall be adequate to provide all information required by the Transfer Station Monthly Solid Waste Report, annexed hereto as Exhibit B;

b. submit the report required by paragraph 9.01(a) of these Regulations and verify the accuracy thereof to the Authority on or before the twentieth (20th) day of the month following the month for which the report is compiled. The report shall be in the form of the Transfer Station Monthly Solid Waste Report, annexed hereto as Exhibit B;

c. make the records required to be maintained and preserved by paragraph 9.01(a) of these Regulations available for inspection by representatives of the Authority during normal business hours.

6. The Eleventh Amendment provides:
   The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

7. There is no contention that the Eleventh Amendment immunizes Vasuki from plaintiffs' claims. *See Pennhurst State School & Hosp. v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 909–10, 79 L.Ed.2d 67 (1984); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Spicer v. Hilton,* 618 F.2d 232, 236 (3d Cir.1980).

ferred." *Petty v. Tennessee-Missouri Bridge Commission, supra,* 359 U.S. at 276, 79 S.Ct. at 787. Stated differently, "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, [a court] will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974) (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). *See also Pennhurst State School & Hosp. v. Halderman, supra,* —— U.S. —— at ——, 104 S.Ct. at 907 (a state's consent to suit against it in federal court must be "unequivocally expressed").

■ Here, plaintiffs assert that Section 6406(a)(5) of the Act constitutes Delaware's consent to the filing of suits in federal court against the Authority. That section states that "the Authority shall have the power to sue and be sued."

In *Florida Dept. of Health v. Florida Nursing Home Assn.,* 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981) (per curiam), the Court held that a Florida statute providing that the Florida Department of Health and Rehabilitative Services had the capacity "to sue and be sued" was insufficient to constitute a waiver of Eleventh Amendment immunity. In discussing the rationale underlying this decision, the Supreme Court recently commented:

> Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system. A State's constitutional interest in immuni-

ty encompasses not merely *whether* it may be sued, but *where* it may be sued.[9]

> [9] —For this reason, the Court consistently has held that a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts.

*Pennhurst State Hosp. v. Halderman, supra,* —— U.S. at ——, 104 S.Ct. at 907.

Similarly, since Section 6406(a)(5) of the Act can be read as consent to state court suits only, it does not provide the required unequivocal indicia of a legislative intent to waive Eleventh Amendment immunity.[8] Consequently, if the Authority is found to be an arm or alter ego of the State of Delaware, it may not be sued in this Court.

■ The ultimate issue in deciding if a public instrumentality, such as the Authority, is an arm or alter ego of the state for Eleventh Amendment purposes is whether the state is the real party in interest. *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *Blake v. Kline,* 612 F.2d 718, 721 (3d Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980); *Urbano v. Board of Managers of New Jersey State Prison,* 415 F.2d 247, 250 (3d Cir.1969), *cert. denied,* 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970); *Gann v. Delaware State Hospital,* 543 F.Supp. 268, 270 (D.Del.1982). Resolution of this issue[9] requires an examination of a number of factors including:

> state law defining the relationship between the agency and the state; whether any judgment would have to be paid out of the state treasury; whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; whether it has autonomy over its operations; whether it

---

**8.** Plaintiffs advance the additional argument that the Authority has sufficient contacts with the federal government to constitute a waiver of Eleventh Amendment immunity including, *inter alia,* cooperation with the United States Environmental Protection Agency in carrying out federal environmental programs and the receipt of federal loans and grants. In light of *Edelman v. Jordan, supra,* and *Florida Department*

*of Health v. Florida Nursing Home Assn., supra,* this argument is unpersuasive.

**9.** The question of whether an agency is the alter ego of a state and thereby immune from federal jurisdiction under the Eleventh Amendment is a question of federal, not state, law. *Blake v. Kline,* 612 F.2d at 722.

has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation; and whether the State had immunized itself from responsibility for the agency's operations.

*Gann v. Delaware State Hospital,* 543 F.Supp. at 270. *See Blake v. Kline,* 612 F.2d at 722–26; *Urbano v. Board of Managers,* 415 F.2d at 250–51; *Smith v. New Castle County Vo-Tech School District,* 574 F.Supp. 813, 817 (D.Del.1983). Although none of these factors is controlling, "[t]he most important factor in the determination of Eleventh Amendment immunity is whether judgment will have to be paid from the state treasury." *Blake v. Kline,* 612 F.2d at 723. *See Urbano v. Board of Managers,* 415 F.2d at 251; *Gibson-Homans Co. v. New Jersey Transit Corp.,* 560 F.Supp. 110, 112 (D.N.J.1982). The degree of autonomy that an agency exercises over its operations is also a factor of critical importance. *Blake v. Kline,* 612 F.2d at 725; *Gibson-Homans Co. v. New Jersey Transit Corp.,* 560 F.Supp. at 112.

Delaware's General Assembly created the Authority as a separate and autonomous "body ... corporate" with broad powers. Its policies are determined and its affairs conducted by a board of seven directors who serve three year terms. 7 Del.C. § 6403 (1983). The Authority's powers include the authority to raise its own funds through the collection of user fees and the issuance of bonds. 7 Del.C. §§ 6406, 6407 (1983).[10] It is also authorized to enter all kinds of contracts and may "sue or be sued." 7 Del.C. § 6406 (1983). Most importantly, Section 6413 of the Act provides that "the Authority shall have no power to pledge the credit or to create any debt or liability of the State...."

While all of the directors of the Authority are appointed by the Governor with the advice and consent of the Senate, the Authority is required to report annually to the General Assembly, and the General Assembly has expressly recognized "its responsibility to monitor and supervise the activities and operations of ... the Authority", 7 Del.C. § 6401(a) (1983), the freedom given to the Authority to run its own affairs and the fact that it is financially independent of the State, at least on the face of the statute, foreclose a dismissal of the Authority on the present record.

The Authority asserts that, given the critical governmental function performed by it, if it were to fail or suffer some crippling adverse judgment, the State would necessarily have to come to its aid with the infusion of public funds. While it may be that a record could be developed which would make this assertion an important factor in the decision as to whether the Authority is an arm of the State, I currently have nothing before me but the language of the Act. *See Blake v. Kline,* 612 F.2d 718 (3d Cir.1979).[11]

III. THE TAX INJUNCTION ACT

The Tax Injunction Act, 28 U.S.C. § 1341, provides:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state.

The Authority and Vasuki assert that by attacking the requirement that all solid waste produced in Delaware be disposed of in Delaware, plaintiffs are acting to restrain the collection of user fees charged by the Authority thereby interfering with the "collection" of a "tax" as those terms

---

**10.** Contrary to the Authority's suggestion, I am not persuaded that the Governor, the Secretary of State, and the State Treasurer have veto powers over the Authority's power to issue bonds. Section 7402 of Title 29 of the Delaware Code appears to apply only to bonds "the payment of which the State has pledged its full faith and credit." 29 Del.C. § 7401(3) (1979).

**11.** The Authority also stresses that the State has agreed to indemnify its directors up to a limit of $3,000,000. While this factor is entitled to some weight, it does not make this situation like one in which judgments against a public corporation are payable by the State.

are defined by the Tax Injunction Act. Defendants further contend that, as a result, this Court is without jurisdiction to entertain plaintiffs' Commerce Clause arguments.

By way of background, the Tax Injunction Act reflects Congressional recognition that "the autonomy and fiscal stability of the States survive best when state tax systems are not subject to scrutiny in federal courts." *Fair Assessment in Real Estate Ass'n. v. McNary,* 454 U.S. 100, 102–103, 102 S.Ct. 177, 179, 70 L.Ed.2d 271 (1981). While the Tax Injunction Act embodies the "fundamental principle of comity between federal courts and state governments that is essential to 'Our Federalism', particularly in the area of state taxation", *Id.* at 103, 102 S.Ct. at 179–80, the statute was directed at several specific concerns which had arisen in the wake of the Supreme Court's landmark decision of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Garrett v. Bamford,* 538 F.2d 63, 66 (3d Cir.), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976). As the Third Circuit delineated in *Garrett v. Bamford,* 538 F.2d at 66, Congress intended to eliminate (1) the practice of large out-of-state corporations using diversity jurisdiction to litigate the validity of state taxes in federal courts thereby gaining an advantage over state citizens who generally had to pay the tax and then sue for a refund in state court, and (2) the ability of foreign corporations to utilize litigation in the federal courts to interminably withhold payment of local taxes and to disrupt local financing. Our Court of Appeals also noted that Congress was cognizant of the fact that federal litigation was time consuming and costly, allowing wealthy foreign corporations to financially wear down state and local taxing authorities until they could attain extremely favorable settlements. *Id. See also Capitol Industries-EMI, Inc. v. Ben-*

*nett,* 681 F.2d 1107, 1112, n. 12 (9th Cir.), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 655 (1982); *Robinson Protective Alarm Co. v. City of Philadelphia,* 581 F.2d 371, 375 (3d Cir.1978). Moreover, although the question remained open for a number of years, it recently has been determined that the Tax Injunction Act applies to actions seeking declaratory as well as injunctive relief. *California v. Grace Brethren Church,* 457 U.S. 393, 411, 102 S.Ct. 2498, 2509, 73 L.Ed.2d 93 (1982); *Exxon Corp. v. Hunt,* 683 F.2d 69, 72 (3d Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983).

■ Turning to the language of the Tax Injunction Act itself, the statute specifically sets forth several requirements which must be satisfied before federal jurisdiction is revoked. First, there must be a "tax" under state law at issue. However, whether an assessment is a "tax" for purposes of the Tax Injunction Act is a question of federal, not state, law. *Robinson Protective Alarm Co. v. City of Philadelphia, supra,* 581 F.2d at 374. Second, the suit must be one seeking to "enjoin, suspend or restrain" the "assessment, levy or collection" of a tax. Finally, there must not be "a plain, speedy and efficient" remedy available in state court.

■ Analyzing the case at bar with this background in mind, I find that plaintiffs' Commerce Clause arguments do not involve a challenge to the "assessment, levy or collection" of a tax, and hence, that the Tax Injunction Act is inapplicable.[12] Defendants correctly note that plaintiffs' second amended complaint includes the contention that plaintiffs will suffer economic injury if the Regulations prohibiting the disposal of Delaware generated solid waste outside the state are upheld since plaintiffs will be unable to take advantage of the lower out-of-state tipping fees. Neverthe-

---

**12.** Plaintiffs have raised as additional grounds for avoiding the jurisdictional bar contained in the Tax Injunction Act, the contentions (1) that the disposal fees charged by the Authority are not taxes within the meaning of the statute and (2) that the state remedies are wholly inade-

quate with respect to the "plain, speedy and efficient" remedy requirement. Since I conclude that plaintiffs do not here challenge the "assessment, levy or collection" of a tax, there is no need to address these contentions.

less, plaintiffs have not directly challenged the Authority's power to charge fees or the amount of those fees. Rather, plaintiffs have attacked the requirement that they use only the Authority's facilities to dispose of solid waste generated within the state.

It seems beyond question that a decision concerning the challenged portions of the Regulations will have some impact on the financial affairs of the Authority. If the challenged Regulations are declared unconstitutional, the Authority might lose revenue which would have to be made up from other sources. However, the Tax Injunction Act does not preclude the federal courts from hearing all cases in which the outcome will have a secondary effect on the financial affairs of a state or an agency thereof.

For example, in *McKay v. Horn,* 529 F.Supp. 847 (D.N.J.1981), the court held that a challenge to the constitutionality of amendments to the Federal Unemployment Tax Act, 26 U.S.C. § 3301, *et seq.* and the New Jersey Unemployment Compensation Law, N.J.S.A. 43:21–1 *et seq.,* reducing unemployment insurance benefits payable to individuals simultaneously receiving pension benefits, social security retirement benefits, or other periodic payments attributable to previous work history was not barred by the Tax Injunction Act. The court rejected the argument that the challenged amendments necessarily affected the calculation of New Jersey employers' payroll taxes [13] thereby impermissibly interfering with the assessment of a state tax, noting that "[s]imply because a federal court order would affect the *amount* of taxes collected by the state pursuant to a particular program does not mean that the court thereby *interferes* with the state's tax-gathering function." 529 F.Supp. at 858 (emphasis in original). Finding that at no time was the validity of the unemployment tax itself brought into question, *Id.,*

the court went on to discuss the issue in more general terms, as follows:

> The federal courts routinely entertain challenges to state laws, policies, practices and procedures which, if successful, would require the state to make additional expenditures and, in the long run, to raise additional revenues in order to fund those expenditures.... If the Tax Injunction Act were deemed to bar such actions simply because a successful outcome might result in an increase in taxes collected by the state, the federal courts' role as a forum for the vindication of federal statutory and constitutional rights would be largely gutted. Where, as here, no challenge is made to the validity of the tax itself, and a decision favorable to plaintiffs would have only a tangential effect upon the state's revenue-gathering function, it is clear that the Tax Injunction Act does not apply.

*Id.* at 859.

Similarly, in *Superior Oil Co. v. City of Port Arthur,* 535 F.Supp. 916 (E.D.Tex. 1982), the court held that the Tax Injunction Act did not bar Superior Oil's challenge to a series of annexations by Port Arthur. As a result of these annexations, the city's boundaries were moved to include a strip of submerged territory in the Gulf of Mexico comprised in part by property owned by Superior. The court found that the suit was not one challenging a tax law, but instead, one attacking the validity of a municipal annexation which brought Superior's property within the ambit of the municipal ad valorem tax ordinance. The court concluded:

> Because Port Arthur's ad valorem ordinance is not being questioned, there is no danger of disruption to the City's taxing scheme. Equitable relief for Superior Oil, in this instance, would not intrude on the enforcement of the City's taxing system. The principle of comity and the

---

**13.** Specifically, defendants asserted that since New Jersey's payroll taxes were calculated on the basis of the employer's "experience rating" (the ratio of the employer's state unemployment fund contributions to the benefits paid from the fund), any successful challenge to the amendments would result in greater benefits being paid with a corresponding drop in the employer's experience rating and higher payroll tax assessments.

purposes of the Tax Injunction Act are not at stake here, and, consequently, federal jurisdiction is intact.

*Id.* at 919. *See also Mobil Oil Corp. v. Tully,* 639 F.2d 912, 917–18 (2d Cir.1981), *cert. denied,* 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981) (Tax Injunction Act did not prohibit entertaining suit attacking anti-passthrough provision of statute imposing 2% tax on gross receipts of oil companies doing business in New York since the provision was not an exercise of the state's taxing powers to assess, levy, or collect taxes but rather an exercise of the state's police powers to control prices); *Mobil Oil Corp. v. Dubno,* 639 F.2d 919, 922 (2d Cir.1981), *cert. denied,* 452 U.S. 967, 101 S.Ct. 3122, 69 L.Ed.2d 980 (1981) (following *Mobil Oil Corp. v. Tully,* in upholding Connecticut's anti-passthrough provision); *Rivero v. Patino,* 524 F.Supp. 136, 142–43 (N.D.Cal.1981) (suit not barred by Tax Injunction Act where decision in favor of plaintiff would have had effect of increasing state unemployment taxes rather than decreasing state tax revenues).

Here, the secondary effects of plaintiffs' Commerce Clause contentions on the Authority's powers to collect disposal fees are simply too attenuated to constitute a challenge to the "assessment, levy or collection" of a tax. Thus, the Tax Injunction Act does not provide an impediment to the exercise of jurisdiction in this case.

## IV. STAY PENDING RESOLUTION OF THE STATE PROCEEDINGS

Vasuki and the Authority urge that this Court should exercise its discretion to stay these proceedings since plaintiffs, on July 25, 1984, instituted parallel proceedings in state court.[14] Plaintiffs respond that since Section 6412 of the Act requires parties challenging regulations adopted by the Authority to file suit within thirty days of their promulgation, the state court action was filed merely as a way to preserve their rights under state law. They also point to the fact that a stipulation has been filed staying the state court action pending the outcome of these proceedings.

■ The power to stay or dismiss federal proceedings pending the resolution of parallel state proceedings resides in the sound discretion of the trial court. However, that power is to be exercised only under exceptional circumstances. *Moses H. Cone Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 13–19, 103 S.Ct. 927, 935–939, 74 L.Ed.2d 765 (1983); *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The Supreme Court has identified a number of factors which must be examined and balanced to determine whether the exceptional circumstances test is satisfied including: (1) the inconvenience of the federal forum, (2) the desirability of avoiding piecemeal litigation, (3) the order in which the proceedings were initiated, and (4) the presence of a *res* or property over which jurisdiction has been asserted. *Moses H. Cone Hospital v. Mercury Construction Corp.,* 460 U.S. at 15–16, 103 S.Ct. at 937, *Colorado River Water Conservation District v. United States,* 424 U.S. at 818–19, 96 S.Ct. at 1246–47. Additional factors to be examined include (1) whether federal law provides the rule of decision on the merits, *Moses H. Cone Hospital v. Mercury Construction Corp.,* 460 U.S. at 23, 103 S.Ct. at 941, (2) the identity of issues in the two forums or lack thereof, *Gilbane Building Co. v. Nemours Foundation,* 568 F.Supp. 1085, 1089 (D.Del. 1983), and (3) the existence of a federal policy militating either in favor or against a stay. *Id.* However, the Supreme Court has cautioned that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Hospital v.*

---

**14.** The defendants do not contend that this is an appropriate case for application of the doctrine of abstention. It is not suggested, for example, that there is any unclear question of state law the determination of which might obviate or materially alter a constitutional issue.

*Mercury Construction Corp.*, 460 U.S. at 16, 103 S.Ct. at 937.

Vasuki and the Authority concede that many of the factors favoring the continued exercise of federal jurisdiction are present in the case at hand. For example, the federal court is a convenient forum, this action was filed before the state proceedings were instituted, and plaintiffs' claims are based on the United States Constitution not state law. However, Vasuki and the Authority argue that a stay is appropriate because of a strong federal policy favoring deference to state courts in matters concerning state revenue collection efforts and because of considerations of judicial efficiency and economy. I do not agree.

With respect to the federal policy favoring deference to state courts in matters concerning state revenue collection efforts, the Authority and Vasuki have correctly identified the policy but have failed to show its applicability to plaintiffs' claims. As has already been discussed in reference to the Tax Injunction Act issue, plaintiffs have not challenged the Authority's right to collect disposal fees or the amount of those fees but instead have attacked the requirement that Delaware generated solid waste be disposed of at the Authority's facilities. The secondary effects that this attack might have on the amount of fees collected by the Authority is simply not sufficient to transform this case into one in which a state's revenue collection efforts are being challenged. Hence, the policy identified by the defendants does not compel the issuance of a stay under these circumstances.

■ With respect to considerations of judicial efficiency and economy, Vasuki and the Authority argue that by instituting legal proceedings in both state and federal court, plaintiffs have imposed burdens on both the courts and defendants that neither should have to bear. However, given the fact that plaintiffs instituted the state court proceedings only to preserve their rights and have stipulated that those proceedings will not go forward as long as these proceedings continue, no significant burdens have been imposed on the defendants and this factor alone clearly does not make this action an exceptional case. Defendants' application for a stay will be denied.

## V. THE COMMERCE CLAUSE

When Delaware's General Assembly adopted the Act, it made the following findings of fact:

> *Findings.*—The General Assembly finds and declares that the people of the State have the right to a clean and wholesome environment; that prevailing solid waste disposal practices generally, throughout the State, result in unnecessary environmental damage, substantially degrade surface and groundwater, waste valuable land and other resources and constitute a continuing hazard to the health and welfare of the people of the State; that local governments responsible for waste disposal services are becoming hard pressed to provide adequate services at reasonable costs, without damage or hazard to the environment and the loss of useful resources; that as a result of inadequate solid waste collection and disposal systems rural areas of the State are particularly subjected to esthetic degradation because of litter; that locally organized voluntary recycling programs have shown that solid wastes produced in the State contain recoverable resources; that technology and methods now exist to dispose of solid wastes and recover resources with commensurate environmental benefits; that coordinated large-scale processing of solid wastes may be necessary in order to achieve maximum environmental and economic benefits for the people of the State; that the amounts of solid waste being produced within the State are adequate to sustain such large-scale processing; that the geography and population density of the State are such as to enable and facilitate the effective and economic regional accumulation of solid wastes; that the development of systems and facilities and the use of the technology necessary to initiate large-

scale processing of solid wastes have become logical and necessary functions to be assumed by state government; that the provision of solid waste disposal services to local governments at reasonable cost, through the use of state governmental powers and capabilities, would supply valuable assistance to such local governments; and, that, because of the foregoing, the provision of statutory authorization for the necessary state structure, which can take initiative and appropriate action to provide the necessary systems, facilities, technology and services for solid waste management and resources recovery is a matter of important public interest. . . .

7 Del.C. § 6401(a) (1983).

Based on these findings, the General Assembly declared the following to be the purposes of the Act:

> *Purpose.*—The General Assembly declares the following to be the purpose of this chapter:
>
> (1) That a statewide comprehensive program for management, storage, collection, transportation, utilization, processing and disposal of solid waste be established.
>
> (2) That a program for the maximum recovery and reuse of materials and energy resources derived from solid wastes be established.
>
> (3) That a program for protecting the land, air, surface and groundwater resources of the State from depletion and degradation caused by improper disposal of solid waste be established.
>
> (4) That a program in cooperation with the United States Environmental Protection Agency, or other federal and state agencies, for the demonstration of systems and techniques of materials recovery, market development and reuse be established.
>
> (5) That a statewide solid waste management plan be developed and implemented by the Authority.

7 Del.C. § 6401(c) (1983).

In furtherance of these purposes, the General Assembly bestowed upon the Au-

thority the power to "control, through regulation or otherwise, the collection, transportation, storage and disposal of solid waste, including the diversion of solid waste within specified geographic areas to facilities owned, operated or controlled by the Authority. . . ." 7 Del.C. § 6406(31) (1983). As earlier noted, the authority thus conferred has been exercised through the promulgation of regulations which require that solid waste collected in any of Delaware's counties must be disposed of at a facility run by the Authority in that county.

■ The threshold inquiry posed by plaintiffs' Commerce Clause challenge is whether the primary purpose or effect of the Act and the implementing Regulations is to favor in-state economic interests or to burden out-of-state economic interests. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). *See also Bacchus Imports, Ltd. v. Dias*, —— U.S. ——, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). I conclude that such "protectionism" is neither the primary purpose nor the primary effect of the challenged State action.

On their face, the Act and the Regulations appear to be an attempt by the State of Delaware to deal effectively with a Delaware health and environmental problem at the expense of the residents of Delaware. They apply, without relevant exception, to all generators and to all collectors of solid waste in any one of Delaware's three counties. Those who collect such solid waste— whether they be from that county, from another county, or from out-of-state—must utilize the designated disposal site or sites in the county of origin. Similarly, the Act and the Regulations do not discriminate between in-state and out-of-state disposal facilities. The distinction drawn is between Authority run facilities and all other facilities wherever located; Delaware generated solid waste may be disposed of at the former and not at the latter.

The plaintiffs do not allege that the *purpose* of the Act and the Regulations is economic protectionism. They do, however, allege that the *effect* is to draw a distinction between solid waste depending on its geographic point of origin and to halt the flow of solid waste generated in Delaware into neighboring states. Since solid waste was held by the Supreme Court in *City of Philadelphia v. New Jersey, supra,* 437 U.S. at 621–23, 98 S.Ct. at 2534–35, to constitute as item of "interstate commerce", plaintiffs maintain that these effects are sufficient to invalidate the challenged portions of the Regulations. Plaintiffs ignore the fact, however, that the virtual *per se* rule of invalidity upon which they rely is not woodenly applied and is directed only to state regulation whose primary effect is to confer a significant benefit on in-state economic interests or to impose a significant burden on out-of-state economic interests. Accordingly, the question is not merely whether a distinction is drawn but whether there is significant discrimination *against* out-of-state economic interests.

While the practical effect of the Act and the Regulations is to draw a distinction between solid waste generated in Delaware and solid waste generated elsewhere, there is no discrimination *against* out-of-state solid waste. A material restriction is placed on the disposal of Delaware generated solid waste; no such restriction is placed on other solid waste. This case is thus unlike *City of Philadelphia v. New Jersey, supra,* in which the State of New Jersey prohibited the disposal of all out-of-state solid waste at New Jersey landfill sites with the practical effect of "impos[ing] on out-of-state commercial interests the full burden of conserving the State's remaining landfill space." 437 U.S. at 628, 98 S.Ct. at 2537.

While it is also true that the Regulations may stop the interstate transportation of Delaware generated solid waste to out-of-

state disposal sites, there is nothing in the complaint or in the record before me which suggests that this will impose a significant economic burden on out-of-state economic interests. Indeed, the record affirmatively indicates that solid waste of the kind to which the Regulations apply has a negative value; both within Delaware and beyond one must pay a fee to induce someone to dispose of it.

I recognize, as does the Act, that solid waste has some reclamation value and that, in some situations, it may even be in demand. This is not a situation, however, where the existence of a significant burden on out-of-state economic interests is apparent enough that it may be assumed without empirical evidence. Indeed, I do not understand plaintiffs to allege that there is a substantial demand among out-of-state disposal site operators for Delaware generated solid waste.[15] The only significant economic burden emphasized in the complaint and the briefing is a burden on in-state collectors, like the plaintiffs, who will be required to pay higher disposal fees for the disposal services which Delaware's General Assembly has found to be essential to the health and well being of Delaware residents.

In short, this is not a typical case of economic protectionism to which a virtual *per se* rule of invalidity is applicable. Rather, this is a case involving a state regulation which is purportedly directed to an important state health and environmental concern, which does not appear to materially favor in-state economic interests, but which may have some incidental impact on commerce between the states. In such circumstances, the role of a reviewing court is quite limited. It may ask only whether the purported state concern is a pretext, *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), and, if not, whether the impact upon

---

**15.** It is of significance, for example, that the plaintiffs represent in-state rather than out-of-state economic interests. As the Supreme Court has noted, "the existence of major in-state inter-

ests adversely affected by the Act is a powerful safeguard against legislative abuse." *Minnesota v. Clover Leaf Creamery Co., supra,* 449 U.S. at 473, n. 17, 101 S.Ct. at 728 n. 17.

interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).[16]

The complaint in this case alleges only that the challenged Regulations "discriminate against" and "burden" interstate commerce. It does not allege that the purported public health objectives of the Act and the Regulations are pretexts or specify an economic burden on out-of-state interests which is claimed to be clearly excessive when contrasted to the benefits sought by the General Assembly. Moreover, plaintiffs' brief makes no such claims. Plaintiffs' brief asserts only that the Authority has not come forward with evidence to demonstrate that a "resource recovery facility will only be viable if all industrial and commercial wastes are brought to that facility" or that "other nondiscriminatory alternatives [do not] exist." Plaintiffs' Answering Brief, p. 33.

I believe the plaintiffs are mistaken as to which side has the burden of going forward with evidence in a situation of this kind. The findings of the General Assembly are due more deference than plaintiffs would accord them. If plaintiffs wish to challenge those findings, they must first allege and then come forward with evidence to show that the claimed benefits are illusory. If they do not challenge those findings, they must allege and prove that the burden on interstate commerce is clearly excessive. *Shapiro v. Cooke*, 552 F.Supp. 581, 588 (N.D.N.Y.1982), *aff'd*, 702 F.2d 46 (2d Cir. 1983); *Tobacco Road v. City of Novi*, 490 F.Supp. 537, 544 (E.D.Mich.1980). Since plaintiffs have failed to so allege, their present complaint fails to state a claim upon which relief can be granted. However, given the fact that plaintiffs have apparently misperceived their burden, they should be afforded an opportunity to amend their complaint and shoulder their burden if they wish to do so. Defendants' motion to dismiss plaintiffs' claim under the Commerce Clause will be dismissed twenty days from the date of this Opinion unless an appropriate amendment is filed.

## VI. THE EQUAL PROTECTION CLAIM

In addition to their Commerce Clause contentions, plaintiffs assert that Section 9.01 of the Regulations [17] violates the Equal Protection Clause. Section 9.01 provides generally that transfer station operators must maintain daily records showing both the source and final disposition of all solid waste handled by the transfer facility. Plaintiffs argue that this provision impermissibly distinguishes between transfer station operators and operators of solid waste collection vehicles who are not required to maintain the same records. This distinction is alleged to be without a rational basis.

In order to withstand plaintiffs' constitutional challenge, Section 9.01 must satisfy the "lenient" requirements of the rational basis test.[18] *Exxon Corp. v. Eagerton*, 462 U.S. 176, 195–196, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983). "Under that standard a statute [or regulation] will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose." *Id. See also Schweiker v. Wilson*, 450

---

**16.** The Supreme Court has expressly recognized resource conservation and environmental protection to be areas of legitimate local concern, *Minnesota v. Clover Leaf Creamery, supra,* 449 U.S. at 471, 101 S.Ct. at 727, and has found that "a State's power to regulate commerce is never greater than in matters traditionally of local concern." *Kassel v. Consolidated Freightways Corp., supra,* 450 U.S. at 670, 101 S.Ct. at 1316. *See also Sporhase v. Nebraska ex rel Douglas,* 458 U.S. 941, 956, 102 S.Ct. 3456, 3464, 73 L.Ed.2d 1254 (1982) ("For Commerce Clause purposes, we have long recognized a difference between economic protectionism, on the one hand, and health and safety regulations, on the other.").

**17.** The text of Section 9.01 is set forth in its entirety, *supra. See* note 5.

**18.** Strict scrutiny is not required since plaintiffs' claim does not involve either a fundamental interest or a suspect classification. *Exxon Corp. v. Eagerton,* 462 U.S. 176, 195–196, 103 S.Ct. 2296, 2308 (1983).

U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461–70, 101 S.Ct. 715, 722–27, 66 L.Ed.2d 659 (1981); *City of New Orleans v. Dukes*, 427 U.S. 297, 303–305, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976).

The transfer station reporting requirements of the Regulations are rationally related to at least three legitimate goals of the Authority. First, a principal responsibility of the Authority is to monitor and plan for solid waste disposal. To that end, it is important that the Authority know the quantities and general sources of the solid waste which it must dispose of in an environmentally sound manner. The records to be maintained by transfer station operators will materially aid in accomplishing this function. Unlike solid waste collectors which are required to include generally the sources and quantities of solid waste which they collect in information that they must submit to the Authority as part of the licensing procedures, such information is not readily available from transfer station operators. The reporting requirements of the Regulations help alleviate this informational gap.

Second, transfer stations have the potential for seriously impairing the Authority's ability to enforce its flow control regulations. When solid waste from another state is brought to a Delaware transfer station, it can be mixed with solid waste from Delaware. Under such circumstances, the commingled solid waste is subject to the flow control sections of the Regulations and must be disposed of at Authority run sites. The reporting requirements make monitoring of the transfer station's activities with regard to solid waste generated in Delaware possible. Enforcement of a solid waste collector's obligation under the flow control portions of the Regulations, on the other hand, while not easy, is substantially less complicated than against a transfer station operator. A collection vehicle, for example, can be observed collecting the solid waste and then disposing of it at some unauthorized location. It is more difficult to detect a transfer station operator who illegally disposes of in-state waste by commingling it with out-of-state waste and then hauls the mixed waste to out-of-state disposal sites.

Third, when solid waste hauling vehicles arrive at an Authority disposal or recycling facility, prohibited substances, such as hazardous wastes may be discovered. The collection vehicle operator will know, at least generally, where he or she has collected the load containing the prohibited substance. The operator of a vehicle from a transfer station will not have such information unless records of the nature required by the Regulations are maintained.

In short, solid waste transfer station operations are significantly different from solid waste collection operations and the reporting requirements are rationally related to proper public objectives. Consequently, Section 9.01 of the Regulations does not offend the Equal Protection Clause.

While it might be that the imposition of similar reporting requirements on solid waste collectors would likewise advance the goals of the Authority to some degree, the Equal Protection Clause does not require that the state "strike at all evils at the same time or in the same way." *Minnesota v. Clover Leaf Creamery Co., supra*, 449 U.S. at 466, 101 S.Ct. at 725 (quoting *Semler v. Oregon State Board of Dental Examiners*, 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935)). The state may "implement [its] program step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *City of New Orleans v. Dukes, supra*, 427 U.S. at 303, 96 S.Ct. at 2516–17. The Authority has adopted Section 9.01 of the Regulations as one step in its efforts to monitor and control the disposal of solid waste. This step does not violate the Equal Protection Clause.

## VII. CONCLUSION

Defendants' motion to dismiss based upon the Eleventh Amendment and the Tax

Injunction Act and their application for a stay will be denied. They are, however, entitled to have plaintiffs' claims under the Equal Protection Clause dismissed pursuant to Rule 12(b)(6). Finally, plaintiffs' claims under the Commerce Clause will be dismissed in twenty days unless an amended complaint is filed which states a claim upon which relief can be granted.